UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Criminal No. 06-290 (RMC) |
| | : | |
| KHALED MOHAMED SHABBAN, | : | |
| also known as Khaled Shabban, | : | |
| also known as Khaled Rashad, | : | |
| also known as Khaled Muhamad Rashad | : | |
| Shabban, | : | |
| | : | |
| Defendant. | : | |

UNITED STATES' OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes defendant's motion to suppress statements. In support of this opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at any hearing on this matter.

1.  Defendant, an Egyptian national, is charged in a single count indictment with international parental kidnaping in violation of 18 U.S.C. §1204. The indictment stems from defendant's November 21, 2004, removal of his child from the United States to Egypt in violation of the terms of a D.C. Superior Court custody order.

FACTUAL BACKGROUND

2.  Defendant entered the United States on August 27, 1998, under a B-1 visitor visa permitting him to accompany an employer. Defendant thereafter lived in the Washington, D.C. metropolitan area continuously until November 21, 2004. During that time, defendant worked in various jobs, including as a courier, a pizza delivery man, and owner of a coffee shop.

2

      3.      Defendant and the mother of their child met in late 1999 or early 2000. The two lived together for several months but did not marry.[1] Their relationship had ended by the time their child was born in August 2001. Defendant and the child's mother always have communicated in English.

      4.      Shortly before the child's birth, with the assistance of an attorney, defendant initiated court proceedings to gain access to the child.[2] These proceedings eventually resulted in the entry of a consent custody order on November 15, 2001, granting the mother primary physical custody of the child and permitting defendant liberal visitation. The order also directs that "[t]he child shall not be removed from the country without the express, written consent of both parties." Although the parties subsequently agreed to modify defendant's visitation rights to delineate specific days and times on which visitation was to take place, the other directives of the November 15, 2001, remained in force.

      5.      At approximately 10:00 a.m. on November 21, 2004, defendant picked up the child from the mother's residence in accordance with the modified visitation agreement. Defendant agreed to return the child by 6:00 p.m., as per the agreement, but failed to do so. Instead, defendant and the child that evening boarded an Al Italia flight leaving Dulles

---

[1] Indeed, defendant was married to another woman from October 1999 until February 2002.

[2] During his six years in the United States, defendant also consulted attorneys to file a petition for permanent residence based on his purported marriage to an American citizen, to prepare an application for alien employment, and to resolve a potential claim arising from an automobile accident.

3

International Airport for Milan, Italy.[3] At around 10:00 p.m., after receiving no word from defendant on the whereabouts or welfare of the child, the child's mother contacted the Metropolitan Police Department to report the child missing.

6.  Soon after defendant arrived in Egypt, he telephoned the child's mother and told her that he had taken their child to Egypt. Defendant and the mother spoke by telephone periodically during the twenty two months that defendant and the child remained in Egypt.

7.  Defendant and the child returned to the United States on September 26, 2006. The two arrived at JFK International Airport in New York at approximately 3:45 p.m. on an Egypt Air flight that originated in Cairo, Egypt. Upon primary customs inspection, as a result of a lookout placed by law enforcement after an arrest warrant for defendant was issued in the District of Columbia on December 22, 2004, defendant and the child were referred for secondary inspection.

8.  During the secondary inspection process, Customs and Border Protection (CBP) officers retrieved defendant's luggage and began to search it within view of defendant. Defendant, who was seated nearby, stood up, approached his luggage and forcefully questioned the search of his luggage. Defendant appeared nervous, frustrated and physically stressed by the prospect that his luggage was about to be searched. CBP officers stood between defendant and his luggage and instructed him to return to his seat. Defendant complied and the search continued.

---

[3] The defendant and the child connected to a flight for Cairo, Egypt the following day. The tickets for these flights were issued on November 16, 2004.

4

9. At approximately 5:15 p.m., after CBP had completed an immigration detainer, FBI Special Agents Shane Dana and Anthony Willett asked defendant to step into an adjacent room, where they informed defendant outside the presence of the child that he was under arrest for international parental kidnaping.[4]  Defendant, who was visibly upset, asked what would happen to the child.  The agents told defendant not to worry and that the child would be well cared for.  Defendant continued to express concern about the child until the agents explained that the child would be reunited with the mother very soon.

10. Defendant then was taken to an FBI office located near the airport and placed in a small booking room.  At approximately 6:00 p.m., in the presence of Agent Willett, Agent Dana advised defendant of his rights.  Specifically, Agent Dana read an advice of rights form to defendant, advising defendant in English that he had a right to remain silent, that anything he said could be used against him, that he had a right to talk to a lawyer for advice before questioning and to have a lawyer present during questioning, that if he could not afford a lawyer, one would be appointed for him before any questioning if he wished, and that if he chose to answer questions without a lawyer present, he could stop doing so at any time.  After reading defendant his rights, Agent Dana asked defendant whether he understood his rights.  Defendant responded that he did.  In order to confirm defendant's understanding of his rights, Agent Dana asked defendant to read the rights card aloud, which defendant did.  Defendant again indicated that he understood his rights and also said that he was willing to talk to the agents without a

---

[4]  Agents Dana and Willett were in the vicinity during CBP's processing of defendant, but they did not participate in any questioning of defendant or the search.  However, CBP officers did show Agent Dana some of the documents and other contents of defendant's luggage found during their search.

5

lawyer present. Defendant then signed the signature line on the rights card below the statement indicating that he had read his rights, that he understood those rights, and that he was willing to answer questions without a lawyer present. Defendant did so without hesitation at approximately 6:03 p.m., and the interview began.

11.    Agent Dana spent a few minutes talking to defendant about some of what he knew about defendant's conduct, then Agent Dana invited defendant to explain why he took the child to Egypt. Defendant did so eagerly. Defendant said that he used to live in Washington, D.C., where he owned a coffee shop. Defendant claimed that prior to the birth of the child, the child's mother had agreed to give the child a Muslim name. Defendant stated that the child's mother changed her mind about the name after the events of September 11, 2001, because she thought that a Muslim name would make the child's life difficult. Defendant did not approve of the name the mother gave the child and indicated that his disapproval led to a court dispute which ultimately resulted in the child's name being changed.

12.    Defendant explained that his child is being very intelligent and that while in the United States, the child was learning three languages: Arabic from defendant, Spanish from the mother, and English in school. According to defendant, the child became confused and had difficulty speaking because the child was learning so many languages. A social worker from the child's school felt that the child needed special education classes. Defendant did not want the child to grow up in a program with other children who had problems, and decided that it would be best for the child to be raised where the child could focus on one language. Defendant stated that the child was able to communicate best in Arabic and defendant felt that by taking the child to Egypt, the child would best be able to learn how to communicate. Defendant stated that he did not ask the child's mother for permission to take the child to Egypt because she would not

6

have given him consent to do so.  Defendant said that he thought he was only going to be gone four or five months before returning the child to the United States.  Defendant also said that he thought something would happen to him upon his return to the United States, and as a result he had considered coming alone, but ultimately decided not to do so.

13.    Upon completing the interview, Agent Dana handwrote a three page statement summarizing his conversation with defendant and asked the defendant to review it.  Defendant reviewed the statement for about ten minutes, during which time he asked Agent Dana why he had included defendant's comment that he could have come alone to see whether he would be arrested.  Agent Dana replied that he had included the comment because that is what defendant said.  Defendant then told Agent Dana that he would like to talk to an attorney before signing the statement.

14.    The interview concluded at approximately 7:00 p.m., after which defendant was booked.  During this process, Agent Dana told the defendant that he had taken custody of defendant's luggage and asked defendant to sign a property receipt reflecting that fact.  Defendant did so.  Agent Dana also asked defendant whether he would consent to a search of the luggage.  Defendant declined to give his consent for a search at approximately 7:27 p.m.

15.    Agent Dana also advised defendant of his right to have law enforcement notify the Egyptian consulate of his arrest.[5]  Specifically, using guidance materials published by the Department of State, Agent Dana informed defendant:

> As a non-U.S. citizen who is being arrested or detained, you are entitled to have us notify your country's consular representatives here in the United States. A

---

[5] The agents do not recall whether defendant was advised of this right before or after the interview.  Therefore, the government will respond to defendant's argument on this issue as though defendant was advised of this right after the interview.

7

consular official from your country may be able to help you obtain legal counsel, and may contact your family and visit you in detention, among other things. If you want us to notify your country's consular officials, you can request this notification now, or at any time in the future. After your consular officials are notified, they may call or visit you. Do you want us to notify your country's consular officials?

"Suggested Statement to Arrested or Detained Foreign Nationals When Consular Notification is at the Foreign National's Option," *Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials To Assist Them*, U.S. Department of State, Bureau of Consular Affairs,(hereinafter "State Department Guidance").[6]  Defendant indicated that he did want his consulate to be notified of his arrest, and that notification was made the following day.

16.     The interview of defendant, as well as all of Agent Dana's other interactions with him, took place in English.  Defendant responded appropriately to Agent Dana's questions throughout the interview, and he answered questions in considerable detail.  Defendant was able to communicate clearly with Agent Dana at all times.

17.     On December 13, 2006, based on an affidavit submitted by Agent Dana detailing defendant's involvement in an insurance fraud scheme in Virginia, a United States District Judge for the Eastern District of Virginia issued a warrant to search defendant's luggage.  The following documents, each written in English, were among those found in defendant's luggage during that search:  a November 2004 travel itinerary for defendant and the child; a typed statement describing defendant's reasons for taking the child to Egypt and his need to return with the child to the United States; various court documents, including documents related to custody

---

[6]     The State Department Guidance is available at the Department's website, located at http://travel.state.gov/law/consular/consular_636.html.

8

of the child; health documents for the child; a letter addressed to defendant from Congressman Al Wynn responding to defendant's inquiry about an immigration matter; marriage interview questionnaire; an application for alien employment certificate for defendant to work at an auto parts supply shop; numerous documents referencing automobiles, including vehicle titles, purchase and repair invoices, and finance and service agreements; documents referencing a coffee shop, including Articles of Incorporation signed in the child's name; and numerous business cards, including over ten cards for lawyers, a legal referral service and a prepaid legal service.

## ARGUMENT

18.     Defendant argues that his statements should be suppressed because the waiver of his *Miranda* rights was not made knowingly, voluntarily and intelligently. Specifically, defendant claims that his *Miranda* waiver is ineffective because his interrogation was conducted in English, which is not his native language; he had no prior criminal interrogation experience; his native custom is to be deferential to law enforcement officials; and he was not advised of his right to have his consulate notified of his arrest. Defendant's Motion to Suppress Statements at 5-7. However, these factors do not render defendant's *Miranda* waiver invalid.

19.     In order to safeguard the privilege against self-incrimination, a suspect who is in custody must be informed, before any interrogation begins, of certain rights, including the right to consult with an attorney and to have counsel present during questioning. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). Once the "accused has expressed his desire to deal with the police only through counsel, he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484 (1980).

9

20.     Under *Miranda*, a defendant's statements in response to custodial interrogation may be used by the government if the defendant has "voluntarily, knowingly and intelligently" waived his Fifth Amendment privilege against self-incrimination. 384 U.S. at 444.

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S 412, 421 (1986) (citations omitted).

21.     The test of voluntariness is whether a defendant's confession is "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (internal quotations and citation omitted) (analyzing voluntariness of consent to search). If the defendant's "will [was] overborne and his capacity for self-determination critically impaired," his confession must be suppressed. *Id.* at 225-26. In determining whether a confession is voluntary, the court should assess "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." *Id.* at 226. Factors to be considered include the youth of the accused, his lack of education or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *Id.* (Citations omitted.) Of course, actual violence by a government agent or a credible threat of violence also may render a confession involuntary. *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991). No single criterion is controlling. 412 U.S. at 226.

10

22.     A waiver generally will be found to be knowing and intelligent if a suspect has been advised of the nature of his rights and the consequences of abandoning them. *See Patterson v. Illinois*, 487 U.S. 285, 293-7 (1988). "Indeed, it seems self-evident that one who is told he has such rights to counsel is in a curious posture to later complain that his waiver of these rights was unknowing." *Id.* at 293. (Citation and internal quotations omitted.) Moreover, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). *See also, Moran*, 475 U.S. at 422; *Oregon v. Elstad*, 470 U.S. 298, 316-7 (1985). Again, "[t]he determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (assessing defendant's waiver of right to counsel in a Sixth Amendment context).

23.     The government need prove waiver only by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). "The administration of proper Miranda warnings, followed by a written waiver of the rights described in those warnings, will usually go far toward demonstrating that a decision to speak is not compelled. If the written waiver is promptly followed by an actual confession, the likelihood that the waiver was valid is often further enhanced." *United States v. Yunis*, 859 F.2d 953, 962 (D.C. Cir. 1988) (citations omitted.)

24.     Although English admittedly is not defendant's native language, defendant clearly is conversant in English, having lived and worked in the United States for over six years from 1998 to 2004. Indeed, defendant and the mother of their child have communicated exclusively

11

in English for years.

25.     Defendant had no difficulty communicating in English with law enforcement officers upon his arrival in the United States. He confronted CBP officers about why his luggage was being searched and he asked FBI agents after his arrest what arrangements were being made for his child. He was able to read his *Miranda* rights aloud to the agents when asked to do so, and he clearly expressed that he understood those rights and was willing to speak to the agents without a lawyer being present. He then waived his rights in writing. During the interview that followed, defendant answered questions appropriately, in considerable detail and without difficulty expressing himself. Moreover, numerous documents written in English were recovered from defendant's luggage. Given defendant's obvious proficiency in English, the fact that English is not his native language does not render his *Miranda* waiver invalid. *See, e.g., Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989), *cert. denied*, 499 U.S. 949 (1991) (defendant's limited English proficiency did not prevent him from making a knowing and intelligent *Miranda* waiver).[7]

26.     Defendant's alienage did not interfere with his ability validly to waive his *Miranda* rights. The D.C. Court of Appeals in *Yunis* considered whether an alien defendant's unfamiliarity with the American justice system was a factor that may have precluded his giving a

---

[7]     Defendant relies heavily in his brief on the Ninth Circuit's decision in *United States v. Garibay*, 143 F.3d 534 (9th Cir. 1998), reversing a trial court's determination that the defendant understood his *Miranda* rights despite being borderline retarded and having limited English skills. The *Garibay* Court noted that with the exception of the interrogating officer, "every witness at the suppression hearing testified that at Garibay's request they would always communicate with him in Spanish." *Id.* at 538. Defendant, in contrast, regularly communicated with the mother of their child in English, had no difficulty communicating with law enforcement officers in English, and never asked law enforcement officers for the assistance of an interpreter. Morever, defendant has not suggested that his comprehension of English is hampered by a low IQ.

12

valid waiver of rights. The Court found that although this factor clearly should be considered, its significance "will be limited to determining whether a defendant knew and understood the warnings that were read to him. The fact that a defendant's alien status may have prevented him from understanding the full, tactical significance of his decision to confess will not invalidate his waiver." *Id.* at 965. In reaching this conclusion, the Court noted that "*Miranda's* primary concern remains the mitigation of coercive tactics in interrogation." *Id.*[8] The Court also found that its conclusion was:

> supported by precedents involving criminal defendants who are American citizens and who are uneducated or of extremely low intelligence. Courts have often held that such defendants can give knowing and voluntary waivers of their *Miranda* rights if those rights are presented to them clearly, if the evidence that they understood these rights is credible, and if -- above all – there is no evidence of threats or other coercion.

*Id.* at 966 (citing cases). The Court subsequently reversed the trial court's determination that the Lebanese defendant's *Miranda* waiver was invalid, finding under the circumstances that he was able to comprehend the basic rights that were presented to him. *Id. See also*, *People v. Al-Yousif*, 49 P.3d 1165, 1170-72 (Colo. 2002) (*en banc*) (reversing trial court's order suppressing *Mirandized* statement taken from native of Saudi Arabia who had lived in United States for four

---

[8] The Court emphasized these points on several occasions, including by citing the following commentary:

> A waiver may be knowing and intelligent in the sense that there was awareness of the right to remain silent and a decision to forego that right, but yet not knowing and intelligent in the sense that the tactical error of that decision was not perceived. But this is no barrier to an effective waiver for *Miranda* purposes, for it "is not in the sense of shrewdness that *Miranda* speaks of 'intelligent' waiver," and thus in "this context intelligence is not equated with wisdom." This is consistent with *Miranda*'s emphasis upon the need to overcome the coerciveness of in-custody interrogation.

859 F.2d at 964 (citations omitted).

13

years, finding that defendant "had English abilities adequate for casual conversation," that "the *Miranda* warnings were given in unbroken, quickly read, but short sentences," that the defendant asked "for clarification when he did not understand a question or a certain word," that he "asked no questions during the reading of the *Miranda* warnings," and that the defendant "stated that he understood the *Miranda* rights when they were read to him.")  Again, given defendant's English proficiency, he, too, was able to understand the basic rights that Agent Dana explained to him. His alien status therefore did not prevent him from validly waiving those rights.

27.    Defendant's lack of interrogation experience also does not render his *Miranda* waiver invalid.  Although defendant may not have prior interrogation experience in a criminal context, he was deposed at length by an insurance investigator in May 2004 regarding claims he had filed following numerous automobile accidents, and in November 2004 he was interviewed by an immigration official regarding his application for permanent residence based on his purported marriage to an American citizen.  Defendant also clearly is aware of the value an attorney's assistance can provide in navigating legal matters, as he previously has consulted attorneys in connection with immigration, child custody and automobile accident matters. Finally, defendant's suspicion that he might be arrested upon returning to the United States enabled him to prepare for that possibility and its potential consequences.  Under the circumstances, his decision to speak to the agents without a lawyer to explain his reasons for taking his child to Egypt was entirely voluntary.

14

28.     The circumstances of this case also clearly demonstrate that defendant's native custom to be deferential to law enforcement officers did not cause him to waive his *Miranda* rights involuntarily.  Defendant was not cowed when CBP officers began to search his luggage, but instead forcefully questioned why they were doing so.  Defendant chose not to sign the handwritten statement summarizing his interview with Agent Dana until he had consulted a lawyer, and he refused to consent to Agent Dana's request to search his luggage.   Defendant also exercised his right to have authorities notify his consulate of his arrest.  These actions clearly indicate that defendant felt entirely free to exercise his rights at will.

29.     Finally, any failure to inform defendant before questioning of his right to have authorities notify his consulate of his arrest did not render his statement involuntary.  Apparently relying on the Vienna Convention on Consular Relations as authority, defendant claims that he "is entitled to the presumption that had he spoken to the Consulate, he would have been urged to remain silent, informed of his right to speak with an attorney in his native language, and members of the Consulate may have come to participate in the interview."  Defendant's Motion to Suppress Statements at 7.  Defendant's argument goes too far.  The Convention provides that authorities must inform a detained foreign national "without delay" of his right to have the authorities inform, again "without delay," his consulate of his detention.  Article 36 of the Vienna Convention on Consular Relations, Apr. 24, 1963, [1970], 21 U.S.T. 77, 100-101, T.I.A.S. No. 6820.  The Convention does not give defendant a right to make this notification personally nor does it give members of the consulate a right to participate in an interview of defendant by law enforcement.  As the Supreme Court in *Sanchez-Llamas v. Oregon*, ___ U.S. ___, 126 S.Ct. 2669 (2006), recently noted, the Convention's consular notification provision:

15

> has nothing whatsoever to do with searches or interrogations. Indeed, [it] does
> not guarantee defendants *any* assistance at all. The provision secures only a right
> of foreign nationals to have their consulate *informed* of their arrest or detention -
> not to have their consulate intervene, or to have law enforcement authorities cease
> their investigation pending any such notice or intervention.

*Id.* at 2681. The "presumption" to which the defendant claims entitlement thus is entirely without foundation.

30.   The Convention also does not provide a remedy should authorities fail to inform defendant of his right to consular notification. As the defendant recognizes, the Supreme Court in *Sanchez-Llamas* declined to extend the exclusionary rule to statements given to police before a defendant was advised of his right to consular notification, holding that "neither the Vienna Convention on Consular Relations nor our precedents applying the exclusionary rule support suppression." *Id.* at 2682. The Supreme Court did state, however, that a defendant may raise a Convention violation "as part of a broader challenge to the voluntariness of his statements to police." *Id.*[9] Defendant was informed of his rights to remain silent, to consult an attorney before

---

[9]   The State Department provides law enforcement officers the following guidance regarding how quickly they should inform detainees of the right to consular notification:

> The VCCR [Vienna Convention on Consular Relations] requires that a foreign national be notified "without delay" of the right to consular assistance. There should be no deliberate delay, and notification should occur as soon as reasonably possible under the circumstances. Once foreign nationality is known, advising the national of the right to consular notification should follow promptly.
>
> In the case of an arrest followed by a detention, the Department of State would ordinarily expect the foreign national to have been advised of the possibility of consular notification by the time the foreign national is booked for detention. The Department encourages judicial authorities to confirm during court appearances of foreign nationals that consular notification has occurred as required.

"Questions about How Consular Notification Should Be Given," State Department Guidance. The agents here followed that guidance by informing defendant no later than the time he was booked of his right to have authorities notify his consulate of his arrest, and by making that consular notification the next day.

16

questioning and to have an attorney present during questioning.  Defendant made clear that he understood his *Miranda* rights and he did not hesitate in waiving them.  Defendant does not point to any facts suggesting that his decision to waive his rights and speak to law enforcement agents was coerced, or that his  "will [was] overborne and his capacity for self-determination critically impaired," by the failure to inform him before questioning of his right to have authorities notify his consulate of his arrest.  *Scneckloth*, 412 U.S. at 225-6.  Considering the totality of the circumstances here, no such facts exist.  Defendant's statement was entirely voluntary.

       31.      For the foregoing reasons, the government respectfully requests that the court deny the defendant's motion to suppress statements.

                                Respectfully submitted,

                                JEFFREY A. TAYLOR
                                United States Attorney

By:      _____
            ANGELA G. SCHMIDT
            Assistant United States Attorney
            Texas Bar No. 17764980
            Federal Major Crimes Section
            555 4th Street, N.W., 4th Floor
            Washington, D.C.  20530
            (202) 514-7273
            Angela. Schmidt@usdoj.gov