# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Criminal No. 06-290 (TFH) |
| | : | |
| KHALED MOHAMED SHABBAN, | : | |
| also known as Khaled Shabban, | : | |
| also known as Khaled Rashad, | : | |
| also known as Khaled Muhamad Rashad Shabban, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANT'S MOTIONS

The government hereby respectfully submits its response to various motions filed by

defendant.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

By: _____/s/_____
ANGELA G. SCHMIDT
Assistant United States Attorney
Texas Bar No. 17764980
Federal Major Crimes Section
555 4th Street, N.W., 4th Floor
Washington, D.C.  20530
(202) 514-7273
Angela. Schmidt@usdoj.gov

I.    Motion to Suppress Confidential Spousal Communications and Tape Recorded
      Conversations ................................................................................................ 1

      A.    The defendant has not satisfied his burden of establishing that he was
            married to the mother of their child at the time the communications occurred ..... 1

      B.    The confidential spousal communications privilege does not apply in this
            case since the victim of the offense is the defendant's child ............................. 3

      C.    The tape recorded conversations were consensual ................................................ 4

II.   Motion to Suppress Tangible Evidence ............................................................. 5

      A.    The warrantless seizure of the defendant's luggage was justified ...................... 5

      B.    The delay in securing a warrant to search the defendant's luggage did not
            render the seizure unreasonable ..................................................................... 8

      C.    The contents of defendant's luggage would have been discovered
            inevitably pursuant to an inventory search ......................................................... 11

      D.    Suppression of the contents of the suitcase in this case would not serve the
            exclusionary rule's purpose of deterring police misconduct ................................ 12

III.  Motion for a Bill of Particulars ...................................................................... 13

IV.   Motion to Strike Surplusage From the Indictment .......................................... 15

V.    Motion for Notice by the Government Pursuant to Rule 12 of its Intention to Use
      Specific Evidence ........................................................................................... 17

VI.   Motion to Identify Witnesses with Juvenile Adjudications and Pending Juvenile
      Proceedings ................................................................................................... 17

VII.  Motion for Notice of Government's Intention to Invoke Residual Hearsay Exception ... 18

VIII. Motion for Notice by the Government of its Intention to Rely on Other Crimes
      Evidence ........................................................................................................ 19

IX.   Motion for Early Disclosure of *Jencks* Material and Timely Disclosure of *Brady/Giglio*
      Material ......................................................................................................... 20

I.    Communications between the defendant and the mother of their child should not be
      <u>suppressed as confidential spousal communications.</u>

     A.    The defendant has not satisfied his burden of establishing that he was
      <u>married to the mother of their child at the time the communications occurred.</u>

Defendant argues that tape recorded conversations between himself and the mother of
their child must be suppressed as confidential spousal communications.  The marital
communications privilege may be asserted by one spouse to prevent the other from testifying to
confidential communications made during the marriage.  *See Trammel v. United States*, 445 U.S.
40, 50-1 (1980).  However, "[i]t is well established that the proponent of a privilege bears the
burden of demonstrating facts sufficient to establish the privilege's applicability."  *In re
Subpoena Duces Tecum to Commodity Futures Trading Comm'n*, 439 F.3d 740, 750 (D.C. Cir.
2006).  The defendant cannot meet this burden because his purported "marriage" to the mother
of their child was void from its inception and because he was married to another woman at the
time the communications in issue were made.

As the government previously noted in its opposition to defendant's motion to suppress
statements, defendant and the mother of their child met in late 1999 or early 2000.  The two
lived together for several months but did not marry in a civil ceremony.  Their relationship had
ended by the time their child was born in August 2001.  The tape recorded communications at
issue in this case occurred between November 21, 2004, when the defendant took the couple's
child to Egypt in violation of a joint custody order, and September 25, 2006, the date the
defendant returned to the United States with the child and was arrested.[1]

---

[1]    The defendant does not seek to suppress as confidential spousal communications the
contents of recorded telephone calls he has made to the mother of their child since his
incarceration.

Defendant apparently relies on a Certificate of Muslim Marriage signed sometime in 2000 as proof of his marriage to the mother of their child.  However, at the same time, the defendant by his own admission, made under penalty of perjury, was married to another woman. According to defendant, that marriage took place in October 1999 and ended in February 2002.[2] Therefore, defendant's subsequent  "marriage" to the mother of their child was void at its inception and did not create a spousal communications privilege.  *See* 46 D.C. Code §401(3) ("[t]he marriage of any persons either of whom has been previously married and whose previous marriage has not been terminated by death or a decree of divorce" is prohibited and "shall be absolutely void ab initio, without being so decreed").

Moreover, defendant did not consider the Muslim "marriage" to the mother of their child, which he claims endures to this day, to be an impediment to his subsequent civil marriage on June 21, 2002, to yet another woman.  The defendant relied on the existence of that civil marriage in filing an application to register permanent residence on September 26, 2002, and he and that woman were interviewed in connection with that application by U.S. Citizenship and Immigration Services on November 18, 2004.  Indeed, in a supplemental nonimmigrant visa application filed in Cairo, Egypt on September 14, 2006, defendant listed that woman, and not the mother of the child, as his spouse.  Therefore, the defendant cannot meet his burden of establishing that he was married to the mother of their child between November 2004 and September 2006, when the communications at issue occurred.

---

[2]     See Defendant's Application to Register Permanent Residence or Adjust Status, signed September 15, 2002.

B.    The confidential spousal communications privilege does not apply in this
case since the victim of the offense is the defendant's child.

As the defendant recognizes, an exception to the confidential spousal communications

privilege exists when, as here, the couple's child is the victim of the offense.  However, citing

the decision of the D.C. Court of Appeals in *Johnson v. United States*, 616 A.2d 1216 (D.C.

1992), defendant seeks to narrow that exception to instances in which the spouse is the only

witness to an offense.  Even could *Johnson* be read as so limited, the D.C. Code thereafter was

amended, effective in May 1995, to make clear that the spousal privilege is inapplicable in intra-

family sexual abuse prosecutions.  *See* 22 D.C. Code § 4124 ("Laws attaching a privilege against

disclosure of communications between a husband and wife are inapplicable in prosecutions

under title II where the defendant is or was married to the victim or where the victim is a child.")

The Federal Rules of Evidence provide that the privilege of a witness "shall be governed

by the principles of the common law as they may be interpreted by the courts of the United

States in the light of reason and experience."  Fed. R. Evid. 501.  Following this guidance,

federal courts have recognized an exception to the spousal communications privilege when a

child is the victim of the offense.  In so doing, the courts have reasoned that "[i]t would be

unconscionable to permit a privilege grounded on promoting communications of trust and love

between marriage partners to prevent a properly outraged spouse with knowledge from testifying

against the perpetrator of such a crime."  *United States v. Bahe*, 128 F.3d 1440, 1446 (10th Cir.

1997), *cert. denied*, 523 U.S. 1033 (1988) (recognizing exception to marital communications

privilege for spousal testimony relating to abuse of a minor child within the household).  *See

also, United States v. White*, 974 F.2d 1135, 1138 (9th Cir. 1992) (recognizing exception to

marital communications privilege for spousal testimony relating to threat against spouse and

spouse's child); *United States v. Allery*, 526 F.2d 1362, 1367 (8th Cir. 1975) (expanding exception to anti-marital facts privilege for offenses committed against a spouse to include crimes done to a child of either spouse). *See generally,* Damon A. King, Annotation, *Competency of One Spouse to Testify Against Other in Prosecution for Offense Against Child of Both or Either or Neither*, 119 A.L.R.5th 275 (2004). The same rationale holds true in this case. Accordingly, the mother of the child victim in this case should be permitted to testify to the contents of her tape recorded conversations with the defendant.

 C. The tape recorded conversations were consensual.

 Defendant suggests that a hearing is necessary to determine whether the mother of their child voluntarily consent to the tape recorded conversations. The defendant does not cite any facts to suggest that the mother did not consent voluntarily to the recordings, and instead simply avers that "it is unknown" whether her consent "was obtained through coercion or duress." Defendant's Motion at 4. The government questions whether such a completely speculative claim warrants an evidentiary hearing. In any event, the circumstances here clearly reflect that the mother's consent to record the calls was consensual.

 Federal law governs the admissibility of consensually recorded calls in federal criminal trials. *See United States v. Edmond*, 718 F. Supp. 988, 993 (D.D.C. 1989). Section 2511(c)(3) of Title 18 permits "a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." The test for consent is not rigorous; "an individual need only proceed despite his or her understanding that the conversation is being recorded." *Id.* (citing cases). The Court need not hear evidence from the consenting party herself in order to evaluate the question of consent, but rather may determine consent

-4-

based on an agent's testimony which establishes that the consenting party "undertook each challenged conversation in a fully cooperative fashion, understanding the consequences, and as part of a larger course of cooperation with the government." *Id.  See also United States v. Wake*, 948 F.2d 1422, 1426-7 (5th Cir. 1991), *cert. denied*, 504 U.S. 975 (1992).

In this case, the mother contacted the Metropolitan Police Department on the same day that the defendant did not return their child under the terms of their visitation agreement.  She thereafter cooperated fully in the investigation of the kidnaping case by the Metropolitan Police, the United States Attorney's Office, and beginning in October 2005, the Federal Bureau of Investigation (FBI).  Soon after she first was contacted by the FBI, the mother turned over a copy a tape of a conversation with the defendant that she had recorded not long after her child's abduction.  Between November 2005 and September 2006, the mother taped approximately thirty additional calls between herself and the defendant with equipment provided by the FBI.  FBI agents were present for the initial calls and many thereafter; however, on some occasions, the mother taped calls on her own and turned those tapes over to the agents.  FBI agents regularly provided direction to the mother on conversations to pursue during the calls to further their investigative strategies, and the mother did so.  The FBI agents did not make any promises to the mother to secure her cooperation in obtaining the recorded calls.  These circumstances clearly indicate that the mother consented to making the recordings in this case.

II.    The seizure and search of the defendant's luggage were lawful.

    A.    The warrantless seizure of the defendant's luggage was justified.

The defendant argues that the warrantless seizure of his luggage after Customs & Border Protection (CBP) agents searched it at the airport was not justified by any recognized exception to

the warrant requirement.[3]  The defendant is mistaken.  The warrantless seizure was justified

because an FBI agent became aware that the suitcases contained evidence related to a long-

standing insurance fraud investigation and also because that agent had a responsibility to

safeguard the defendant's property after the defendant's arrest at the airport.

As the government previously noted in its opposition to defendant's motion to suppress

statements, on September 25, 2006, FBI Special Agent Shane Dana went to JFK International

Airport to await the defendant's arrival in the United States in order to arrest him on an

outstanding warrant for International Parental Kidnaping.  Agent Dana was in the secondary

inspection area, where CBP officers searched the defendant's luggage.  Although Agent Dana did

not participate in the search, CBP officers shared with him information regarding some of the

items they found.  Agent Dana immediately recognized several items as pertinent to a staged

accident insurance fraud investigation that he had been pursuing since September 2004.[4]  After

---

[3]    Defendant does not challenge the authority of CBP officers to search his luggage upon
his attempt to enter the United States, nor could he do so successfully.  *See United States v.
Ramsey*, 431 U.S. 606, 619 (1977) (border searches "from before the adoption of the Fourth
Amendment, have been considered to be 'reasonable' by the single fact that the person or item in
question had entered into our country from outside.  There has never been any additional
requirement that the reasonableness of a border search depended on the existence of probable
cause").

[4]    Agent Dana nonetheless did not search the defendant's luggage immediately upon
becoming aware of  these incriminatory items.  Instead, Agent Dana secured the luggage and
later applied for a warrant to search it.  Agent Dana's affidavit in support of that search warrant
describes his observation of the CBP's search as follows:

> The CBP officer conducted a security screen of the four bags that were checked
> by Shabban and his carry-on.  I was in the room during the search and able to
> observe the items reviewed and spoke with CBP officers who conducted the
> search.  CBP officers identified two different U.S. drivers licenses for
> SHABBAN, each having a different date of birth.  CBP officers also reviewed
> numerous documents which included approximately twenty (20) eight and a half
> by eleven papers, of various types, related to driver claims or policy information
> regarding insurance claim information.  Other documents were identified in the

CBP officers had concluded their search and finished processing an immigration detainer, Agent Dana arrested the defendant and took custody of the defendant's luggage incident to that arrest. Agent Dana then transported the defendant's luggage to his Northern Virginia office, where he secured the luggage and sealed it using evidence tape. The luggage remained secured in that location and condition until December 15, 2006, when Agent Dana searched it pursuant to a federal warrant issued in the Eastern District of Virginia on December 13, 2006.

Contrary to the assertion in the defendant's motion, Agent Dana had ample probable cause to seize the defendant's luggage when he became aware from the CBP's lawful search that it contained evidence related to an insurance fraud investigation. In seizing the defendant's luggage at that time, Agent Dana did exactly what was necessary to prevent the loss or destruction of evidence, and also to safeguard the defendant's personal belongings. *See United States v. Place*, 462 U.S. 696, 701 (1983) ("Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.") Agent Dana's seizure of movable luggage that was known to contain evidence of a crime and that belonged to a defendant who had been arrested in a public place clearly was justified.

---

name of [a woman whom the affidavit earlier explains allegedly was involved in an automobile accident with the defendant], to include a checkbook. Affidavit in Support of Application for Search Warrant at pp. 6-7.

B.    The delay in securing a warrant to search the defendant's luggage did not
prejudice the defendant or render the seizure unreasonable.

Defendant next argues that even if the warrantless seizure of his luggage was justified, that seizure became unreasonable because of the 79-day delay in obtaining a search warrant.[5]  The government believes that the delay did not render the seizure unreasonable for several reasons: first, defendant had a negligible or significantly reduced expectation of privacy in his luggage because it already had been searched at the border; second, defendant did not have any liberty interest interrupted by the delay in searching his luggage given that he was arrested and subsequently detained pending trial; and third, the defendant's possessory interest in his luggage reasonably was safeguarded by the agent's actions in securing the luggage, particularly when the defendant did not make any requests for an alternative disposition of his luggage.

In determining whether the delay in obtaining a search warrant rendered the seizure of defendant's luggage unreasonable under the Fourth Amendment, the Court should consider the extent of the protected interests at stake.[6]  In this case, the defendant's decision to seek entry to

_____

[5]    Given the exclusionary rule's primary purpose of deterring future police misconduct, the reasonableness of the delay more appropriately might be measured not by the date that the warrant was obtained, but rather by the date that the agent submitted an affidavit in support of an application for a warrant to government attorneys for review.  *See, e.g., United States v. Calandra*, 414 U.S. 338, 347 (1974) ("the [exclusionary] rule's prime purpose is to deter future unlawful police conduct").  In this case, Agent Dana submitted the affidavit for review no later than October 30, 2006, 35 days after the seizure of the luggage.

[6]    The government has not found any case law with facts similar to those present here.  The government notes that several courts in different contexts have rejected the notion that the Fourth Amendment is an appropriate vehicle for an individual to regain possession of property that was seized lawfully.  *See, e.g., Lee v. City of Chicago*, 330 F.3d 456, 460-6 (7th Cir. 2003) (city's refusal to return impounded car after law enforcement interest in it had ceased, pending owner's payment of towing and storage fees, is not a Fourth Amendment seizure); *Fox v. Van Oosterum*, 176 F.3d 342, 349-52 (6th Cir. 1999) (refusal to return lawfully seized driver's license until tickets were paid is not a Fourth Amendment violation); *United States v. Jakobetz*, 955 F.2d 786, 802 (2d Cir.), *cert. denied*, 506 U.S. 834 (1992) (retention of defendant's photograph in

the United States defeated any reasonable expectation of privacy that he may have had in his

luggage.  *See Chadwick v. United States*, 433 U.S. 1, 13 (1977), *abrogated on other grounds by*

*California v. Acevedo*, 500 U.S. 565 (1991) (noting that substantial expectations of privacy exist

in luggage because, among other reasons, its contents "are not open to public view, *except as a*

*condition to a border entry or common carrier travel*" (emphasis added)).  Under the

circumstances of this case, where CBP agents subjected defendant's luggage to a lawful border

search, the Fourth Amendment's purpose in protecting a person's privacy interests in luggage

would not be served by finding that any remaining privacy interests the defendant may have had

in his luggage after the border search were trampled by the delay in obtaining a search warrant.

The defendant does not contend that the delay in obtaining a search warrant for his

luggage resulted in the deprivation of any liberty interest, nor can he.  *See, e.g., United States v.*

*Place*, 462 U.S. 696, 708 (1983) (in analyzing the reasonableness of a *Terry* seizure of a

traveler's luggage, the Court noted that "the police conduct intrudes on both the suspect's

possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary").

---

violation of state law is not a seizure deserving of the Fourth Amendment's "special
protections").  The courts instead have reasoned that a seizure, by definition, protects only "an
individual's interest in retaining his property but not the interest in regaining possession of
property."  *Fox*, 176 F.2d at 351.  *See also, Lee*, 330 F.3d at 466.  "[O]nce that act of taking the
property is complete, the seizure has ended and the Fourth Amendment no longer applies."  *Fox*,
176 F.2d at 352.  *See also, Lee*, 330 F.3d at 466.  In determining when and under what terms the
property may be returned, the Seventh Circuit in *Lee* suggested that the Fifth and Fourteenth
Amendments would be more appropriate forums to balance the competing interests at stake.  *Id.*

Other courts, however, have held that the duration of a seizure must be reasonable, even
when that seizure is lawful at its inception.  *See, e.g.,United States v. Martin*, 157 F.3d 46, 54 (2[d]
Cir. 1998) (11-day delay in obtaining warrant for UPS package following probable cause seizure
was not unreasonable); *United States v. Respress*, 9 F.3d 483, 488 (6th Cir. 1993) (10-hour delay
in obtaining warrant for in-transit defendant's suitcase following probable cause seizure was not
unreasonable).  The facts of these cases are distinguishable in significant ways from the facts
here.

The defendant here was arrested at the same time his luggage was seized, and he subsequently was held without bond pending trial. As a result, the delay in obtaining a warrant to search the defendant's luggage did not restrain the defendant in any way. *Compare id.* (seizure of traveler's luggage "can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return").

Finally, the defendant's possessory interest in his luggage quite reasonably was protected by the agent's conduct in taking his luggage to his office, as that conduct ensured its safekeeping. *See Chadwick*, 433 U.S. at 19 (Blackmun, J. and Rehnquist, J., *dissenting*) (a person arrested in a public place "is likely to have various kinds of property with him.... In such instances the police cannot very well leave the property on the sidewalk or street while they go to get a warrant.... Rather than requiring the police to 'post a guard' over such property, I think it is surely reasonable for the police to take the items along to the station with the arrested person"). *See also, United States v. Markland*, 635 F.2d 174, 176 (2d Cir. 1980), *cert. denied*, 451 U.S. 991 (1981) ("[p]olice have a duty to protect both the lives and the property of citizens"); *United States v. Gravitt*, 484 F.2d 375, 378 (5th Cir. 1973), *cert. denied*, 414 U.S. 1135 (1974) ("[t]his Court consistently has recognized that the Fourth Amendment is not violated when the police take custody of the property of persons they arrest to store that property for safekeeping").

Although the defendant had the means available in Fed. R. Crim. P. 41(g) to gain access to, or the return of, property that he believed to have been seized unlawfully, he did not avail himself of those means. Nor does defendant in his motion argue that he was prejudiced in the preparation of his defense or in any other way by the delay in obtaining a warrant to search his luggage. Under these circumstances, the delay in obtaining that warrant should not be deemed unreasonable.

-10-

C.    The contents of defendant's luggage would have been discovered
      inevitably pursuant to an inventory search.

Had Agent Dana not sealed the defendant's luggage pending issuance of a search warrant,

he would have been required by standard FBI procedures to inventory that luggage.  Such a

warrantless search is entirely justified.  *See Illinois v. Lafayette*, 462 U.S. 640, 647  (1983)

("[e]xamining all the items removed from the arrestee's person or possession and listing or

inventorying them is an entirely reasonable administrative procedure"); *South Dakota v.

Opperman*, 428 U.S. 364, 372 (1976) (in approving routine inventory search of lawfully

impounded automobile, court stated that "inventories pursuant to standard procedures are

reasonable").  Thus, had Agent Dana conducted an inventory search, he lawfully would have

discovered, at a much earlier date, the evidence that he ultimately recovered during the warrant-

authorized search.  *See Nix v. Williams*, 467 U.S. 431 (1984).  ("[w]hen ... evidence ... would

inevitably have been discovered without reference to the police error or misconduct, there is no

nexus sufficient to provide a taint and the evidence is admissible").  *Compare United States v.

$639,558 in United States Currency*, 955 F.2d 712, 718-21 (D.C. Cir. 1992) (upholding trial

court's finding that the money in train passenger's suitcase would not been discovered inevitably

pursuant to an inventory search, since the owner of the luggage would have been released had the

luggage not been searched unlawfully without a warrant) *with United States v. Gale*, 952 F.2d

1412, 1416-7 (D.C. Cir.), *cert. denied*, 503 U.S. 923 (1992) (upholding trial court's finding that

evidence found in defendant's car would have been discovered, without regard to defendant's

illegally-obtained statements, pursuant to a post-impoundment inventory search).

D.      Suppression of the contents of the suitcase in this case would not serve the
        exclusionary rule's purpose of deterring police misconduct.

By sealing the defendant's luggage pending issuance of a search warrant, rather than

immediately inventorying the luggage, Agent Dana intended to afford, and in actuality did afford,

the defendant a greater level of protection under the Fourth Amendment than he was due.  Under

these circumstances, no deterrent purpose of the exclusionary rule would be served by

suppressing the evidence Agent Dana obtained only after searching the defendant's luggage

pursuant to a warrant.

In *Hudson v. Michigan*, ___ U.S. ___, 126 S. Ct. 2159, 2165 (2006), the Supreme Court

held that a violation of the Fourth Amendment's knock-and-announce rule in executing a search

warrant did not require suppression of the evidence obtained in the ensuing search.  In reaching

its ruling, the Court considered that "[s]uppression of evidence ... has always been our last resort,

not our first impulse" and that the exclusionary rule should be applied only "where its remedial

objectives are thought most efficaciously served, that is, where its deterrence benefits outweigh

its substantial social costs."  *Id.* at 2163 (citations and internal quotations omitted).  The Court

found that the purpose of the knock-and-announce rule was to afford the occupant "the

opportunity to collect oneself before answering the door," and not to prevent "the government

from seeing or taking evidence described in a warrant."  *Id.* at 2165.  The Court then reasoned

that "[s]ince the interests that were violated in this case have nothing to do with the seizure of the

evidence, the exclusionary rule is inapplicable."  *Id.*

In this case, any deterrence benefits that would be served by suppressing evidence found

in a warrant-authorized search of lawfully-seized luggage because of a delay in obtaining that

warrant are far outweighed by the substantial social costs of suppressing the evidence.[7]   As the

dissenters noted in *Chadwick*, the Court need not adopt an approach that would have the

"perverse result of allowing fortuitous circumstances to control the outcome of the present case."

433 U.S. at 22.[8]

III.     The indictment and discovery adequately inform the defendant of the charge.

Defendant seeks a bill of particulars, arguing that the indictment is "fatally defective"

because it does not identify the victim, the locations where the alleged offense occurred, the times

of the offense, and any fact to support the allegation that the defendant intended to obstruct the

lawful exercise of parental rights.  *See* Defendant's Motion at 1-2.  These contentions are plainly

without merit.

"A bill of particulars can be used to ensure that the charges brought against a defendant

are stated with enough precision to allow the defendant to understand the charges, to prepare a

defense, and perhaps also to be protected against retrial on the same charges."  *United States v.*

*Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987).  However, "if the indictment is sufficiently

specific, or if the requested information is available in some other form, then a bill of particulars

---

[7]       The government notes that the magistrate judge who authorized the search warrant on
December 13, 2006, knew from Agent Dana's affidavit that the luggage initially had been seized
on September 25, 2006.  Agent Dana acted in good faith in seizing the defendant's luggage and
in obtaining the search warrant.  Thus, in executing that warrant, it also was entirely reasonable
for Agent Dana to believe that the search was constitutional.  *See United States v. Leon*, 468 U.S.
897, 922 (1984) (exclusionary rule should not be applied to exclude evidence seized pursuant to
a defective search warrant if the officers conducting the search acted in "objectively reasonable
reliance" on the warrant).

[8]       Should the Court determine that the duration of the delay in obtaining a search warrant
for the defendant's luggage was constitutionally unreasonable and that application of the
exclusionary rule is an appropriate sanction for that delay, the Court nonetheless should allow
the government to use the evidence obtained from the defendant's luggage when appropriate to
impeach the defendant's testimony.  *See United States v. Havens*, 446 U.S. 620 (1980).

is not required." *Id.* Both conditions hold true here.

Simply read, the indictment charges the defendant with removing a child, whose initials are A.K.S., from the United States on November1, 2004,[9] and retaining that child outside of the United States until September 25, 2006, with the intent to obstruct the lawful exercise of parental rights. The child victim of the offense is identified only by initials to protect the child's privacy; however, those initials adequately identify the victim as the defendant's child. The dates set forth in the indictment correspond to the dates that the defendant left the United States with the couple's child and the almost two years the defendant kept the child outside of the United States. Although the indictment does not refer specifically to all of the locations where events pertinent to the offense took place, it certainly reflects that a critical location was outside the United States. Finally, the statute referenced in the indictment specifically defines the term "parental rights" as "the right to physical custody of the child – whether joint or sole (and includes visiting rights); and whether arising by operation of law, court order, or legally binding agreement of the parties." 18 U.S.C. §1204(b)(2)(A) and (B).

If the operative facts of the case are not plain to the defendant from the language of the indictment, they certainly were made abundantly clear from the ample discovery already provided in this case. That discovery reflects that the defendant picked up the child victim in Washington, D.C. on November 21, 2004, under the terms of a visitation agreement with the child's mother; that he left Dulles International Airport for Egypt with their child that same day; that he did so in direct defiance of the visitation agreement and a joint custody order, entered on November 15, 2001, in the Superior Court for the District of Columbia, that specifically provides, "[p]rimary

---

[9]    This date should read November 21, 2004. The government will correct this typographical error by seeking a superseding indictment.

physical custody shall be with the mother" and "[t]he child shall not be removed from the country without the express, written consent of both parties;" and that he kept the child in Egypt until their return to JFK International Airport in New York on September 25, 2006. The defendant thus has more than enough information to understand the charge against him and to prepare a defense. A bill of particulars would add nothing to that information and is not warranted.

IV.    The indictment does not contain prejudicial surplusage.

Defendant argues that the inclusion of his aliases and the phrases "at least" and "and elsewhere" in the indictment is unnecessary and prejudicial surplusage. The government disagrees that any language in the indictment is prejudicial, but nonetheless does not object to striking the phrase "at least" from the indictment.

A pretrial motion to strike an alias from an indictment should not be granted "[i]f the Government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment." *United States v. Clark*, 541 F.2d 1016, 1018 (4th Cir. 1976). *See also, United States v. Emuegbunam*, 268 F.3d 377, 394-5 (6th Cir. 2001), *cert. denied*, 353 U.S. 977 (2002) (although the Sixth Circuit "strongly disapprove[s]" of the practice of including aliases in an indictment, the practice nonetheless is permitted "if it is necessary to connect the defendants with the acts charged" (citations and internal quotations omitted)).

The inclusion of defendant's aliases in the indictment is proper here since the defendant used each of those various names during the commission of the offense. For example, the passport the defendant used to travel to the United States in 1998 and to leave the United States in 2004 lists his name as *Khaled Mohamed Rashad Mohamed Mahmoud Shabban*. The defendant also provided this name, albeit substituting Mohamed for Mahmoud, to the FBI agent who

-15-

arrested him at JFK International Airport in September 2006.  During his six years in the United States, the defendant apparently shortened his name to *Khaled Shabban* or *Khaled Mohamed Shabban*.  Specifically, the defendant used this name in initiating the D.C. Superior Court child custody proceedings in August 2001 and on the child's birth certificate.[10]  However, when the defendant took his son from the United States in November 2004 and returned to the United States in September 2006, he traveled with tickets issued in the name *Khaled Rashad* or *Khaled Mohamed Rashad*.[11]  Finally, the defendant used the name *Khaled Mohamed Rashad Mohamed*, a name which does not appear on the indictment, on the Egyptian passport he obtained in February 2005 and on the application for a nonimmigrant visa that he submitted to the U.S. Embassy in Cairo in September 2006.  The defendant specifically identifies Mohamed as his surname in those documents.  Since each of the aliases listed in the indictment identifies the defendant with the act charged,  those aliases should remain in the indictment.[12]

---

[10]     The defendant also used the name Khaled Shabban or Khaled Mohamed Shabban in numerous other contexts, including on the certificate reflecting a Muslim marriage to the mother of their child and the certificate reflecting his June 2002 marriage to another woman, on his September 2002 application to register permanent residence, in a May 2004 sworn examination before the Maryland Automobile Insurance Fund regarding his filing of numerous automobile accident insurance claims, in documents related to his incorporation of a coffee shop in May 2004, and in acquiring a social security number.

[11]     The defendant also purchased a ticket for his son under an alias with the initials A.R.

[12]     The defendant cites Judge Friedman's decision in *United States v. Hsia*, 24 F. Supp. 14, 24-5 (D.D.C. 1998) as support for his argument that the aliases should be stricken even if the government's evidence will include the different names listed in the indictment.  Judge Friedman based his ruling in *Hsia* on the fact that there were "no allegations in the 27-page indictment" that referred to the defendant by the alias, "suggesting that neither she nor any of her co-conspirators ever used the name ... in connection with the acts charged in the indictment."  *Id.* at 25.  Since, as noted, the defendant here did use the aliases listed in the indictment in committing the act charged, this case is readily distinguishable from *Hsia*.

-16-

The inclusion of the phrase "and elsewhere" in the indictment also is entirely proper. The very nature of the charge requires the government to prove that the defendant removed a child "from the United States" or retained a child "outside the United States." As such, the use of the phrase "and elsewhere" to encompass other locations where the offense occurred hardly can be considered immaterial or prejudicial.

V.    The government adequately has informed the defendant of the evidence it will seek to use in its case-in-chief.

The defendant requests that the Court order the government, pursuant to Fed. R. Crim. P. 12(b)(4), to provide notice of any evidence it intends to use in its case-in-chief that is otherwise discoverable under Rule 16 and arguably subject to suppression. By discovery letters dated October 27, 2006, and March 12, 2007, the government specifically identified and provided copies of the evidence, obtained to date, which it intends to use in its case-in-chief.[13] This case is not one involving voluminous documents or recordings.[14] Under the circumstances, Rule 12 does not require the government to do more.

VI.    The government does not intend to call any witnesses with juvenile records that would be subject to disclosure.

Defendant also asks the Court to order the government to identify all witnesses with either juvenile adjudications or pending juvenile proceedings, and he cites *Davis v. Alaska*, 415 U.S.

---

[13]    Defense counsel also physically inspected the evidence that the government disclosed in its discovery letters, as well as items that were seized from the defendant's luggage but that, in the government's view, do not pertain to this prosecution. After that review, the government also provided copies of additional items requested by the defendant.

[14]    The government has identified as evidence that it may use in its case-in-chief approximately thirty consensually-monitored calls between the defendant and the mother of their child. Although the government reserves the opportunity to use any of these recordings, the government currently is preparing transcripts for eight recordings, namely Tapes 0, 1, 3, 9, 10, 18, 25 and 29.

-17-

308 (1974) and Fed. R. Crim. P. 609(d) as support for this request.  To the government's

knowledge, none of its witnesses has a pending juvenile case or is under probationary supervision

for juvenile matters.  The government does not believe that either *Davis* , which requires the

government to disclose a witness's status as a juvenile offender when it would support a claim of

bias, *see* 415 U.S. at 317-9, or Rule 609(d) requires it to disclose all juvenile adjudications of its

witnesses, and the government declines to do so.

VII.    The government will provide timely notice of any evidence it may seek to introduce under
        <u>the residual exception to the hearsay rule</u>.

The defendant also asks the Court to order the government to provide notice under Fed. R.

Evid. 807 of its intention to invoke the residual exception to the hearsay rule.  Rule 807 requires

the proponent of residual hearsay to make the particular statement "known to the adverse party

sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity

to prepare to meet it."  Since the rule already requires the government to provide notice of its

intention to invoke the residual exception, there is no need for the Court to intercede to order such

notice.

At this time, the government expects that any hearsay evidence it may seek to introduce

will fall within one of the recognized hearsay exceptions set forth in Fed. R. Evid. 803 and 804.

The government's anticipated evidence may include government documents such as passports,

visas, visa applications, I-94 forms, and other immigration-related documents.  The government

intends to proffer these documents as public records under Rule 803(8).  *See, e.g., United States

v. Pluta*, 176 F.3d 43, 49 (2[d] Cir.), *cert. denied*, 528 U.S. 906 (1999) (admitting passports under

Rule 803(8)).  However, in the event that the Court disagrees that such evidence falls within the

parameters of Rule 803(8), the government may seek to argue in the alternative that such

evidence is admissible under Rule 807.

-18-

VIII.    <u>The government does not intend to rely on any other crimes evidence in its case-in-chief.</u>

   The defendant also asks the Court to order the government to provide notice of its intent to rely upon other crimes evidence it intends to introduce at trial.  Fed. R. Evid. 404(b) requires the prosecution to "provide reasonable notice, in advance of trial" of any such evidence.  Again, there is no need for the Court to intercede to order notice that the rule already requires.

   In its discovery letters dated October 27, 2006, and March 12, 2007, the government provided notice of the following other crimes evidence:

> Your client falsely stated on his visa application that he had not withheld custody of a U.S. citizen child outside the United States from a person granted legal custody by a U.S. court.

> Your client married an American citizen on June 21, 2002, for the sole purpose of obtaining permanent residence status in the United States.  Your client submitted an application with the Immigration & Naturalization Service toward that end in September 2002, and he and his purported spouse were interviewed by the office of U.S. Citizenship & Immigration Services on November 18, 2004.  The application subsequently was denied as a sham.

> In 2003 and 2004, your client also submitted numerous fraudulent insurance claims for reimbursement of property damage and medical treatment in connection with staged automobile accidents.

   In addition, by letter dated April 30, 2007, the government provided the defendant a copy of his sworn examination by a Maryland Automobile Insurance Fund investigator.  In that examination, the defendant admits that he had lied to an insurance company.

   With the exception of the visa application, which the government believes is intrinsic evidence of the offense charged, the government does not intend to use in its case-in-chief the other crimes evidence it has disclosed to the defense.  Should the defendant testify, however, the government may seek to cross examine him about this misconduct in order to impeach his credibility.

-19-

IX.    The government is aware of its obligations to disclose *Brady/Giglio* and *Jencks* material in <u>a timely way and will do so.</u>

Finally, defendant asks the Court for an order directing the government to produce *Jencks* material one month before the suppression hearing and to disclose all *Brady/Giglio* material immediately.  The government is not aware of any information that arguably could be considered *Brady* material and that has not been disclosed to the defense already.  This case is not one involving voluminous *Jencks* or *Giglio* materials.  Indeed, the government already has provided to the defendant the reports of interviews that were conducted with the mother of the child victim and most of the other police reports that were generated in connection with the investigation of this case.  Any additional *Jencks* materials are largely cumulative of the reports already provided and are expected to comprise roughly forty pages or less for each witness.  However, in order to avoid any delay at trial, the government proposes to provide the additional *Jencks* materials and any *Giglio* materials to the defendant after the jury is sworn for any witnesses anticipated to testify that day and thereafter, the evening before a witness is expected to testify.