UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **Criminal No. 06-290 (TFH)** |
| | : | |
| **KHALED MOHAMED SHABBAN,** | : | |
| **also known as Khaled Rashad,** | : | |
| **also known as Khaled Mohamed Rashad** | : | |
| **Mohamed Mahmoud Shabban,** | : | |
| **also known as Khaled Mohamed Rashad** | : | |
| **Mohamed,** | : | |
| **also known as Mohamed Rashad Khaled,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following sentencing recommendation and reasons in support of such recommendation:

1.       On June 21, 2007, defendant was convicted following a jury trial of International Parental Kidnaping in violation of 18 U.S.C. § 1204(a). The conviction stems from defendant's removal of his three-year-old child to Egypt on November 21, 2004, in violation of a D.C. Superior Court Consent Custody Order, and his retention of the child in Egypt for twenty two months thereafter.

2.       In fashioning an appropriate sentence for defendant, the government asks the Court to take into account the following factors: the extensive planning that preceded the offense; defendant's flagrant violation of a court order to which he consented in a custody proceeding that he initiated; defendant's thoughtless disregard of the anguish that his actions

2

would and did cause the child's mother; the emotional and developmental damage defendant

caused his young son by taking him suddenly from his mother and the only home he had known,

and by denying him of his mother's love and nurturing for two very formative years of his life;

defendant's use of his son as a means to accomplish his own return to the United States;

defendant's feigned lack of English proficiency during an interview with an expert linguist and

his untruthful testimony at the motions hearing; and defendant's complete lack of remorse for his

actions.  In light of these factors, the government requests that the Court sentence defendant to

the statutory maximum sentence of three years imprisonment.

BACKGROUND

3.    Defendant entered the United States on August 27, 1998, under a B-1 visitor visa

permitting him to accompany an employer.  Defendant thereafter lived in the Washington, D.C.

metropolitan area continuously until November 21, 2004.  Defendant and the mother of their

child met in late 1999 or early 2000.  The two lived together for several months but did not

marry.  Their relationship had ended by the time their child was born in August 2001.

4.    Shortly before the child's birth, defendant initiated court proceedings to gain

access to the child.  These proceedings eventually resulted in the entry of a consent custody

order on November 15, 2001, granting the mother primary physical custody of the child and

permitting defendant liberal visitation.  The order also directs that "[t]he child shall not be

removed from the country without the express, written consent of both parties."  Although the

parties subsequently agreed to modify defendant's visitation rights to delineate specific days and

times on which visitation was to take place, the other directives of the November 15, 2001, order

remained in force.

3

OFFENSE CONDUCT

5.    Defendant's planning of the offense began as early as January 27, 2003, when defendant added his son to his Egyptian passport without the mother's knowledge. In doing so, defendant provided a name for his son that differs from the name on his son's birth certificate. In approximately October 2004, defendant told his roommate of his intention to take his son to Egypt. When the roommate asked how the son's mother would feel about that plan, defendant responded, falsely, that she did not care.

6.    Defendant's stated plan to leave with his son took shape soon thereafter. Defendant sold a coffee shop that he owned for $35,000 cash. Defendant also asked his roommate to replace him on the apartment lease and to reimburse him for his share of the security deposit. On November 16, 2004, defendant purchased one-way airline tickets for himself and his son to travel from Washington Dulles Airport to Cairo, Egypt on November 21, 2004. In doing so, defendant used the name Khaled Rashad as opposed to Khaled Shabban, the name that he had used consistently throughout his six years of residence in the United States and the name he used to obtain the Consent Custody Order. Defendant also purchased a ticket for his child in the same false name that he had provided when he added the child to his Egyptian passport.

7.    On November 20, 2004, defendant, having packed all of his personal belongings, asked his roommate to accompany him to the airport so that he could check his luggage in advance of his flight, which the airline declined to do. At dinner that night, defendant told his roommate that he wanted to go back to Egypt and that he was leaving because he was tired of the United States. Defendant did not mention any other reason for leaving to his roommate.

4

8.      Early the following morning, the child's mother dropped off her son at defendant's residence in accordance with the modified visitation agreement and then went to work.  Defendant called the child's mother later that day to ask what to feed the child and to tell her that he wanted to take the child to an amusement park.  When she got off work around 3:00 p.m., the child's mother called defendant, but he did not answer.  She continued to call every half hour as the afternoon wore into evening, with no success.

9.      Knowing that the child's mother would be looking for him and the child, defendant called his roommate around 6:00 p.m., the time he was required to return the child under the modified visitation agreement, and asked him to leave the apartment and not return until 10:00 p.m.  Defendant claimed, falsely, that he was going to Canada, where his cousin had arranged a marriage for him, rather than Egypt, and that he was bringing a shy girlfriend to the apartment.  Defendant's roommate obliged his request and left the apartment.  Meanwhile, defendant and the child boarded their scheduled flight to Egypt and left the United States.

10.      When defendant did not return the child by 6:00 p.m., the child's mother went to defendant's coffee shop in search of defendant and her child.  There she learned, much to her surprise and dismay, that defendant had sold the shop.  She then went to defendant's apartment building, but she did not see any lights on in his apartment until after 10:00 p.m., when defendant's roommate returned.  The child's mother knocked on the apartment door and asked defendant's roommate about defendant and her son's whereabouts.  Defendant's roommate, who seemed surprised by her request, confirmed what she had feared, that defendant had left the country with her son.  Borrowing the roommate's phone, the child's mother immediately contacted the Metropolitan Police Department to report the child missing.  At no time did defendant tell the child's mother of his plans to take the child to Egypt, and at no time did she

agree to those plans.

11.     Soon after defendant arrived in Egypt, he telephoned the child's mother and told

her that he had taken their child to Egypt.  In a subsequent call a short time later, which the

child's mother recorded, defendant seemed euphoric about being reunited with his family.  When

the child's mother asked when defendant planned to come back, he told her to "forget about

America.  Just come here and live with us."  Transcript of Tape 0 at p.3.  Defendant also said

that he "cannot come back no more," because "I don't want it."  *Id.* at p. 6.  In imploring the

child's mother to come to Egypt, defendant acknowledged, "your son need you," and "his

mommy is the only person can give my son all the love he needed."  *Id.* at pp. 4, 9.

12.     Defendant and the child's mother spoke by telephone periodically during the

twenty two months that defendant and the child remained in Egypt.  Many of those conversations

also were recorded.  Within a year of his departure, defendant had become increasingly

disenchanted with his life in Egypt.  He referred to his homeland as "the stupid Egypt."

Transcript of Tape 1 at p. 7.  He also acknowledged that it would be easy for him to return his

son to the United States simply by going to the Embassy, *id.* at pp. 9, 11, and that "Egypt is not

good for my son."  Transcript of Tape 3 at p. 5.  However, defendant did not do so because he

clearly wanted also to return to the United States.  Transcript of Tape 1 at p. 6.  As he later

explained to the child's mother, "I didn't plan to stay in Egypt.  I didn't plan for that, Chamaca.

I should be married since I come.  But I'm not thinking for to live in Egypt.  Chamaca, I went to

the interview for my green card before I leave....  Okay.  I'm plan to come back, just take like six

months or something like, you know....  But when I come and I stay, I found, it's complicated for

me to come back."  Transcript of Tape 15 at pp. 6, 10.

6

13.     In June 2006, defendant finally began to take concrete steps so that his child could return to the United States.  Specifically, defendant sent the child's mother a Statement of Consent form so that defendant could obtain a U.S. passport for the child.  Defendant insisted that he was prepared to "get the ticket from my own money" and send his son back to his mother Transcript of Tape 25 at p. 5.  Defendant again acknowledged that his son had everything he wanted except, "He need you.  Only you.... my son still needs his mommy." *Id.*  After the child's mother completed the consent form and returned it to defendant, he in fact obtained a passport for the child.

14.     In mid-August 2006, defendant agreed to allow the child to return to the United States, escorted by a friend of the child's mother, in time for the beginning of the school year. The Federal Bureau of Investigation then purchased a one-way plane ticket for the child and a round trip plane ticket for the escort to travel to Egypt to accompany the child back to the United States.  Defendant, however, inexplicably did not bring the child to the airport in time to make the scheduled flight.

15.     In the weeks that followed, defendant, who then had possession of the child's plane ticket, told the child's mother that he had rescheduled the child's flight and made arrangements for the child to return with an airline escort.  However, defendant still was not able (or willing) to bring about the child's return.  In mid-September 2006, defendant applied for and obtained a visa allowing him to return to the United States for the stated purpose "[t]o take my Son back to his school, and take him to Eyes Doctor & make a Hormone test for him."  Gov't Trial Exh. 12.

16.     Defendant and the child finally returned to the United States on September 26, 2006.  Defendant was arrested upon his arrival pursuant to a warrant that was issued in the

7

District of Columbia on December 22, 2004.  After being advised of and waiving his *Miranda* rights, defendant admitted to FBI Special Agent Shane Dana that he had not asked the child's mother for permission to take the child to Egypt because she would not have given him consent to do so.

<u>DEFENDANT'S EVIDENCE AT THE MOTIONS HEARING</u>

17.    Through counsel, defendant challenged the admissibility of his post-arrest statement to Agent Dana, asserting, among other claims, that his *Miranda* waiver was not made knowingly, voluntarily and intelligently because his interrogation was conducted in English, which is not his native language.  To support this claim, defendant participated in a tape-recorded interview with Dr. Andrea Tyler, an expert in linguistics, to determine his English-speaking proficiency.[1]  During the interview, Dr. Tyler asked defendant "what he thought I meant if I said, *'You have the right to leave the room'*.  He appeared to interpret it as a command to leave the room.  When asked how he would understand, *'You have the right to remain silent'* he said *'I know silent.'*" Report of Dr. Andrea Tyler at p.7, introduced as Defendant's Motions Hearing Exh. 2.  Based largely on that interview, Dr. Tyler testified at the motions hearing that defendant had difficulty understanding abstract concepts with which he was not familiar. Specifically, Dr. Tyler opined that defendant would have had difficulty understanding the *Miranda* warnings if they just were read to him without explanation or translation.

18.    Defendant also testified at the motions hearing that he did not understand the concept of a "right," as used in the *Miranda* warnings, in terms of a privilege or an entitlement. Instead, defendant testified that he understood the word only as to direction, that is, as in "right

---

[1]    The tape was introduced on June 11, 2007, as Gov't Motions Hearing Exh. 22.

8

or left," or as to propriety or accuracy, that is, as in "right or wrong."

## SENTENCING GUIDELINE CALCULATIONS

19.     The Presentence Investigation Report (hereinafter "PSR") calculates defendant's total offense level at 19 and his Criminal History Category as I, resulting in a Guideline range of 30 to 36 months imprisonment, the latter of which is truncated by the statutory maximum sentence.  The total offense level includes a three-level enhancement of the base offense level because defendant substantially interfered with the administration of justice and a two-level enhancement because one of the victims of the offense was a child.  The government agrees with these enhancements, but also believes that additional two-level enhancements are warranted because defendant obstructed justice.

### Enhancement for Substantial Interference with the Administration of Justice

20.     The applicable Sentencing Guideline in this case provides for a three-level enhancement of defendant's base offense level "[i]f the offense resulted in substantial interference with the administration of justice." USSG § 2J1.2(b)(2).  The Guideline defines this phrase to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." USSG § 2J1.2, comment. (n.1).  This list is not exhaustive and "other acts-if similarly or even more disruptive of the administration of justice-could serve as bases for the ... enhancement." *United States v. Amer*, 110 F.3d 873, 885 (2d Cir.), *cert. denied*, 522 U.S. 904 (1997).

21.     The PSR concluded that this enhancement applies because defendant fled the United States after abducting his child, thereby "stalling the ongoing investigation into staged automobile acts in which he was a suspect, and causing the FBI to devote unwarranted time,

9

money and man hours to cause the defendant to return to the United States." PSR at ¶ 27. The

government agrees. In support of this enhancement, the government has attached to this

memorandum an affidavit by Agent Dana that describes in detail how defendant's offense

impacted his investigation of a group of individuals, defendant among them, who were engaging

in insurance fraud based largely on staged automobile accidents, and the substantial government

resources that were spent, in both time and money, seeking to return defendant to the United

States to face the pending abduction charge and to reunite the child with his mother. *See United

States v. Tackett*, 193 F.3d 880, 886-7 (6th Cir. 1999) (enhancement supported if district court

can "(1) identify a particular expenditure of government resources (time or money), (2) which

but for the defendant's conduct would not have been expended, and (3) was 'substantial' in

amount").

22.    The government also believes that the enhancement is appropriate because the

defendant took his son to Egypt to avoid a clash between "American law" and his view of what

was in the best interest of his son's education. In *Amer*, also an international kidnaping case, the

Court upheld the application of a three-level enhancement to the defendant's offense level for

"substantial interference with the administration of justice," finding that the defendant's "'self-

help' act of removing the children from New York could serve as a basis for the enhancement.

Although the abduction did not interfere with an ongoing proceeding, this act prevented proper

legal proceedings from occurring by taking matters completely outside the purview of the

administration of justice." *Id.* In reaching this conclusion, the Court quoted favorably from the

District Judge's comment that, "It is a situation in which he deemed himself the judge, and then

he made the decision....  The defendant ... wholly ignored the lawful process, and acting in the

form of a vigilante, if you will, took matters into his own hands." *Id.*

10

23.    Here, too, defendant took matters into his own hands and left the United States with his son specifically to avoid "American law."  As he explained to the child's mother in a telephone conversation recorded on January 17, 2006:

MR. SHABBAN:  Let me tell you something, Chamaca.  Maybe it can make you feel much better before, you know?  In American law, they don't care about how we feel.

MS. HERNANDEZ:  Um-hum.

MR. SHABBAN:  Okay?  The law in America is very strong, everybody under the law, okay?  The law in America is to protect the kids the best that you can, you know?

MS. HERNANDEZ:  Um-hum.

MR. SHABBAN:  The first thing, the kids.  It doesn't matter what other people going to feel or going to think or going to do, you know?  The important thing is the kids.

MS. HERNANDEZ:  Yes.

MR. SHABBAN:  But when they misunderstand the kids, it's a big problem.

*   *   *

MR. SHABBAN:  ...We cannot do nothing with a social worker if, if she decides to send [the child] to another school.  Why?  Because the American law force anybody to do the good and the best for the kids.  And American law going to believe the social worker and never going to believe us for two reason:  I'm Arabic Muslim and you are Hispanic born.  You understand?

MS. HERNANDEZ:  Um-hum.

MR. SHABBAN:  This is what is going to happen with [the child].  Now, I'm glad, Chamaca.  I come here because I know my country's very good with children ....

Transcript of Tape 9.

11

24.     Defendant's resort to self help, in flagrant defiance of a custody order that he

sought and to which he consented, for the stated purpose of avoiding the intervention of the court

system in his child's education, clearly warrants an enhancement for substantial interference

with the administration of justice.

Enhancements for Obstruction of Justice

25.     The government also believes that two-level enhancements under USSG § 3C1.1

for obstruction of justice are warranted for two reasons: first, after defendant abducted his child,

he repeatedly questioned the child's mother about whether she had contacted the police,

attempted to dissuade her from doing so, and instructed her what to tell anyone who inquired

about his reasons for taking the child; and second, defendant intentionally underplayed his level

of English proficiency during his interview with Dr. Tyler and committed perjury at the motions

hearing by claiming that he did not understand the *Miranda* warnings.

Attempts to Influence a Witness

26.     The Sentencing Guidelines call for a two-level enhancement "[i]f (A) the

defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration

of justice with respect to the investigation, prosecution, or sentencing of the instant offense of

conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction

and any relevant conduct."  USSG § 3C1.1.  As examples of conduct meeting this definition, the

Commentary's Application Notes specifically include "threatening, intimidating, or otherwise

unlawfully influencing a ... witness ..., directly or indirectly, or attempting to do so" and

"threatening the victim of the offense in an attempt to prevent the victim from reporting the

conduct constituting the offense of conviction."  USSG § 3C1.1, comment. (n.4(a) & 4(k))

Defendant's conduct here squarely falls within these examples.

12

27.    For example, in a telephone conversation that took place shortly after the

defendant took his son to Egypt, the defendant asked the child's mother whether she had gone to

the authorities and warned her that no one could take the child from him:

MR. SHABBAN.  Chamaca, did you make any problem?

MS. HERNANDEZ.  Huh?

MR. SHABBAN.  Did you make any problem?

MS. HERNANDEZ.  Did I make problem with who?

MR. SHABBAN.  For me.

MS. HERNANDEZ.  Why?

MR. SHABBAN.  Did you go in the court?

MS. HERNANDEZ.  Yes.  No, I have not going in the court. But I need to know

what you going to do, Chamaco.  What time do you want to come back?

Transcript of Tape 0 at p. 3.

MR. SHABBAN. . . .  Trust me.  Nobody can take my son from me.  Nobody.

Nobody in the United States of America, the people listening to me right now.  Nobody can take

my son from me.  I'm not stupid. Trust me, Chamaca.  If you (indiscernible) this way, trust me,

Chamaca, nobody can handle this situation with me.  I know what I'm doing.  I know what I'm

doing.  I know what I'm doing. Trust me, Chamaca.  Don't let me keeping my son hiding all the

time. Let him be free, let him be free.  Don't cause me problem.  Don't make me weak.

(Indiscernible).  Don't make me weak.  Please, Chamaca, don't make me.

MS. HERNANDEZ.  How I gonna make you weak if you... How I can make you

weak?  Come on.

13

MR. SHABBAN.  Don't cause me problem.  When you allow some people to listen to me right now.  When you're doing this stuff, you're making me weak.

MS. HERNANDEZ.  Yeah, but I'm in the office, so no one is listen to you.

Transcript of Tape 0 at pp. 13-14.

MS. HERNANDEZ.  I don't know, Chamaco.  I don't think that's right what you did.  Poor my chiquitito, you know.

MR. SHABBAN.  Please Chamaca, be smart, Chamaca, don't cause me problem, because if you cause me a problem, that's mean I'm going to be very weak.

Transcript of Tape 0 at p. 17.

28.     Over the course of the next twenty two months, defendant also repeatedly admonished the child's mother to "be good, don't be bad."  *See, e.g.,* Transcript of Tape 1 at pp. 15-16.  On November 24, 2005, defendant warned the child's mother not to do "any stupid stuff" and also instructed her what to say in the event she was asked why he took the child to Egypt:

MR. SHABBAN.   Okay, Chamaca.  Chamaca, please, Chamaca.

MS. HERNANDEZ.   Huh?

MR. SHABBAN.   Don't do any stupid stuff.

MS. HERNANDEZ.   No, Chamaco.

MR. SHABBAN.   Please.

MS. HERNANDEZ.   Don't worry about it.

MR. SHABBAN.   Don't do any stupid stuff.

MS. HERNANDEZ.   No, Chamaco.  I told you I going to send you money.  I'll send you money.  Don't worry about it.

MR. SHABBAN.   No, I'm not talking about the money.  You know what I'm

14

talking about.  You know exactly what I'm talking about.

MS. HERNANDEZ.   Then what, Chamaco?

MR. SHABBAN.   Don't do any stupid stuff, Chamaca for us.

MS. HERNANDEZ.   No, Chamaco.  I told you no.

\* \* \*

MR. SHABBAN.   Well, if somebody contact you.  If somebody contacts, contact you... to ask about it, just say what happened, ok.  Say (indiscernible) [the child] will need to be in place just with one language because he was confused by the both language, and he cannot speak.

MS. HERNANDEZ.   Yeah.

MR. SHABBAN.   Okay?

MS. HERNANDEZ.   Yeah, but nobody has calling me.

MR. SHABBAN.   Be smart.

MS. HERNANDEZ.   Uh-huh.  Nobody has calling me, Chamaco.

MR. SHABBAN.   They're going to call you.  Don't worry.  They're going to call you.  The Congressman going to call you.

MS. HERNANDEZ.   Okay.

MR. SHABBAN.   Because I contact him, Chamaca, in the e-mail.

MS. HERNANDEZ.   Okay.

MR. SHABBAN.   Okay?  He going to call you.  Trust me.

MS. HERNANDEZ.   All right.

MR. SHABBAN.   They're going to call (indiscernible) information from you.

MS. HERNANDEZ.   Yeah.

15

MR. SHABBAN.   [The child], why [the child] went Egypt.  You talk to me.
Why [the child] went Egypt?

MS. HERNANDEZ.   Why he went Egypt?  Because in the school they tell him
he has a problem because he's speaking three languages so he needs...uuum,...

MR. SHABBAN.  Yes, Chamaca.

MS. HERNANDEZ. ...to speak only one language --

MR. SHABBAN.   That's all what I -- that's all.

MS. HERNANDEZ.   That's all, right?

MR. SHABBAN.   Not more than that, okay?

MS. HERNANDEZ.   Okay.

Transcript of Tape 3 at pp. 6-8.

29.    Finally, on September 22, 2006, just before defendant returned to the United
States, defendant again questioned the child's mother about whether she had gone to the police,
sought assurances that she would not to do so, and suggested that he could come alone first to
test whether she had done so:

MR. SHABBAN.   So we're ready to come, Chamaca, okay?

MS. HERNANDEZ.   All right, Chamaco.  No problem.  Anytime, I told you.

MR. SHABBAN.   Yes, Chamaca.

MS. HERNANDEZ.   Don't worry about it, okay?

MR. SHABBAN.   Don't break my life, okay?

MS. HERNANDEZ.   Oh, come on.  Um-um, don't worry about it.

MR. SHABBAN.   Chamaca, you need me, Chamaca.

Transcript of Tape 29 at p. 2.

16

MR. SHABBAN.   After I leave, me and [the child], did you call the police? What did you tell them?

MS. HERNANDEZ.   I didn't call the police.  I wait until you call me because I didn't know where were you.  You went to Kings Dominion or what do you do because you told me, "we're coming late."  You have any problems, they come in and say to you, no.

MR. SHABBAN.   Okay.  The police come to my home, Chamaco. Why did they come to my home?

Transcript of Tape 29 at pp. 3-5.

MR. SHABBAN.   (Indiscernible) we are coming and I wish, wish nothing bad happen, you know.

MS. HERNANDEZ.   Now, what's going to happen, Chamaco?

MR. SHABBAN.   I'm gonna die, Chamaca (indiscernible). Why?  Because you know I'm gonna lost the opportunity to see my son all the rest of my life.

MS. HERNANDEZ.   No.

MR. SHABBAN.   That mean I gonna die, Chamaca.  (Indiscernible) end up in jail, you know.

MS. HERNANDEZ.   No, Chamaco.

MR. SHABBAN.   I'm gonna be in jail.  I'm going to lose my son (indiscernible). I don't think you like that.

MS. HERNANDEZ.   No, Chamaco.

MR. SHABBAN.   I don't think so.

MS. HERNANDEZ.   No.

MR. SHABBAN.   I'm coming back, you know.  I'm coming back.  Let me tell

17

you example, Chamaca.  I wish you would understand that.  I have a visa for five years, multi-entrance.

  MS. HERNANDEZ.  Um-hum.

  MR. SHABBAN.   That I come and I leave.  I come and I leave, okay?  If, for example, (indiscernible) to help my son.  For example, you know, I can come by myself first to check out what's going on.  And then I come back to get my son.  But I don't want to do that, because, if I had something bad happen to me, where my son is going to be?  He's going to be with you, okay?

  MS. HERNANDEZ.  Um-hum.

  MR. SHABBAN.   But if I come alone and something happen with me, where is going to be my son?  He's going to be in Egypt. I don't want that.

  Transcript of Tape 29 at pp. 5-6.

  MR. SHABBAN.   It's dangerous for me and I am in risk. (Indiscernible) what happen if I went there, and just arrived to airport in New York and they lock me up?  What can I do?  I have nothing to do.  But it's good for my son.  Why?  Because my son is going to be with his mommy.  And if I don't care about son, I should, you know what?  Leave [the child] in Egypt and go to first, to the USA, and if it is fine, bring [the child].  If it is not fine, go back to [the child].

  MS. HERNANDEZ.  Yeah.

  MR. SHABBAN.  You hear me?  You get my point?

  MS. HERNANDEZ.  Yeah.

  MR. SHABBAN.  If I don't care about [the child].  But I care about [the child].

  MS. HERNANDEZ. Alright.

18

MR. SHABBAN.  (Indiscernible).

MS. HERNANDEZ.  Yeah I know that.

MR. SHABBAN.  You understand what I mean?

MS. HERNANDEZ.  Yes, Chamaco.  No problem.  I told you, whatever you want, it's alright for me, Khaled.  Okay?

MR. SHABBAN.  You swear of your mommy?

MS. HERNANDEZ.  I swear.  No problem.  I swear for [the child].  Whatever you want, it's okay, Chamaco.  You want to do like this, no problem.

Transcript of Tape 29 at pp. 13-14.

30.     The import of these conversations is clear:  had defendant known with certainty that the child's mother had reported or would report the child's abduction to the court or the police, he would not have returned to the United States or permitted his son to return.  The case law supports the application of an obstruction of justice enhancement under these circumstances. *See, e.g., United States v. Peterson*, 385 F.3d 127, 139-43 (2d Cir. 2004) (enhancement applied to defendant who wrote letters to co-defendants "urging them not to cooperate with the Government, to maintain certain stories and positions, and to repeat certain versions of events that were not true"); *United States v. Thompson*, 210 F.3d 855, 861-2 (8th Cir. 2000), *cert. denied*, 532 U.S. 996 (2001) (enhancement applied to defendant who, among other things, had telephoned witness and "demanded that [the witness] swear on the lives of his children that he had not cooperated with authorities"); *United States v. Booth*, 996 F.2d 1395, 1397 (2d Cir. 1993) (enhancement applied to defendant who instructed victim not to talk to the FBI about sexual activity or drug use and to tell other victims not to talk to the FBI); *United States v. Atkinson,* 966 F.2d 1270, 1277 (9th Cir. 1992), *cert. denied*, 507 U.S. 1004 (1993) (enhancement

19

applied to defendant who contacted witnesses and told them not to speak with the police and

who helped concoct a false story the witnesses should tell the authorities if forced to do so);

*United States v. Cherif*, 943 F.2d 692, 703 (7th Cir. 1991), *cert. denied*, 503 U.S. 961 (1992)

(enhancement applied to defendant who wrote a letter to witness telling her that she "could not

know anything" about scheme, which court construed as "a subtle and somewhat clever attempt

to tell her, 'Don't spill the beans'").  *See also United States v. Craft*, 478 F.3d 899, 901 (8th Cir.

2007) (evidence that defendant had contacted two witnesses and instructed them not to cooperate

with investigators sufficient to support witness tampering conviction); U*nited States v. Morrison*,

98 F.3d 619, 629 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1131 (1997)  (evidence that defendant

told witness what to say "if anybody asks me," which account was false, sufficient to support

witness tampering conviction).

<u>Defendant's Evidence at the Motions Hearing</u>

31.    Defendant also obstructed justice in this case by deliberately underplaying his

level of English-speaking proficiency in the interview with Dr. Tyler and by testifying falsely at

the motions hearing that he did not understand the concept of a "right," as used in the *Miranda*

warnings, in terms of a privilege or an entitlement.  This conduct also clearly falls within the

examples of obstructive conduct set out in the Commentary's Application Notes 4(c)

("producing or attempting to produce a false [or] altered ... record during [a] ... judicial

proceeding") and 4(b) ("committing ... perjury").

32.    At the motions hearing and during the trial of this case, the Court had the

opportunity to listen to numerous tape-recorded conversations between defendant and the child's

mother, all of which took place before defendant's arrest in September 2006.  In those

conversations, defendant spoke fluidly and in complete sentences, and he was able to relate his

20

thoughts clearly and effectively.  Although his statements at times were repetitive in nature,

defendant rarely struggled for words.  Defendant also clearly had no difficulty understanding the

child's mother, as he responded appropriately to her comments.  In stark contrast, defendant's

speech was significantly less effective during his lengthy, tape-recorded interview with Dr. Tyler

on May 10, 2007.  In that conversation, defendant spoke haltingly, answered questions in simple,

one word phrases or choppy sentences, repeatedly asked for clarification, and often did not

respond appropriately to the question that was asked.

     33.    The Court noted this striking difference in defendant's English proficiency in

denying  defendant's motion to suppress his post-arrest statements to the FBI.  Specifically, the

Court acknowledged that defendant had a motive to underplay his proficiency during the

interview with Dr. Tyler, and found, based on the recorded telephone conversations, that

defendant's interview did not reflect accurately his ability to understand English as well as he

does.  The Court's finding in this regard clearly supports the conclusion that defendant

deliberately attempted to produce a false record of his English-speaking proficiency, and thus

sway Dr. Tyler's opinion regarding a fact critical to the outcome of his suppression motion.  As a

result, the conduct supports a two-level enhancement for obstruction of justice.

     34.    Defendant also should receive a two-level enhancement for obstruction of justice

because he committed perjury at the motions hearing by testifying that he did not understand the

meaning of the term "right" as used in the *Miranda* warnings.  Instead, defendant testified that

he understood the word only as to direction, that is, as in "right or left," or as to propriety or

accuracy, that is, as in "right or wrong."  Defendant's testimony was contradicted directly by two

statements he made in recorded telephone conversations with the child's mother.  Specifically,

defendant on November 7, 2005, stated:

21

MR. SHABBAN.   Yeah, it's easy for me to take [the child] from his hand, and his bed, and his clothes, his books, his toys, and go to the embassy.  "Excuse me, guys, please," you know, "I don't want my son to be in Egypt.  I don't want my son to grow up in Egypt.  I don't like that.  I am -- I'm here with my son just to help him to speak and now my son is good.  I want him to continue United States, he's an American, and have right to be in the United States." Okay?

Transcript of Tape 1 at p. 9.

35.     Similarly, on June 14, 2006, defendant stated:

MR. SHABBAN. ...  I have him here in my country, nobody in the world, in the world can have him, can take him out of my hands.  Only one.  It's him.  He's asking you without no question, he's asking me, "daddy, where is my mommy?"  Before he asking me this question, I have to show him his mommy.  It's his right, you know?  I cannot just be happy, with my son hurt, no way.  Be smart, Chamaca.

Transcript of Tape 25 at p. 3.

36.     In denying defendant's motion to suppress his statements, the Court specifically noted that it had "great difficulty" with defendant's credibility and cited these recorded conversations as evidence that before his arrest, defendant understood the concept of a "right" as an entitlement or privilege, despite his testimony to the contrary.  This finding amply supports the conclusion that defendant committed perjury during his testimony at the motions hearing. The testimony bore directly on the crux of defendant's motion to suppress his statement to the FBI, that is, whether he understood and voluntarily waived his *Miranda* rights.  Moreover, his testimony on this point was wilful and not the result of confusion, mistake or faulty memory.

22

*See United States v. Gaviria*, 116 F.3d 1498, 1529 (D.C. Cir. 1997), *cert. denied sub nom.*, 522 U.S. 1082, 1132 (1998) (enhancement properly applied because district court credited other witness's trial testimony over that of defendant and defendant's testimony was contradicted in taped conversations).

<u>IMPACT OF THE DEFENDANT'S CRIME</u>

37.    For months after her child was abducted, the child's mother left her Christmas tree standing in her home, with her son's unwrapped presents beneath it, in the hope that her son soon would return to open them.  Agent Dana immediately realized the depth of the pain defendant had caused the child's mother when he saw that tree in her living room the first time he met her in October 2005.  The devastating emotional toll that defendant's crime exacted on the child's mother also was readily apparent from the recorded telephone conversations, her testimony at trial, and her comments in the victim impact statement.  As she so aptly stated in the latter, "No mother should ever have to experience the almost two years of torture.  This crime killed me slowly.... I worried about him all the time.  I thought I would never see my son again. I was living in sadness all the time.  This was nightmare."  Victim Impact Statement at 2. Defendant's cruel and selfish act caused the child's mother to miss two years of holidays, birthdays and countless precious moments in her child's life.  More importantly, defendant's act caused the child's mother to miss participating in her son's daily development during two very formative years of his life.  During the twenty two months defendant kept the child in Egypt, she also endured innumerable dark periods of frustration and despair that coincided with constant shifts in defendant's moods and actions with respect to returning the child to the United States. The most crushing of these periods occurred when defendant agreed in August 2006 to allow the child to return to begin the school year, but then failed to follow through on that promise.  To

23

this day, the child's mother suffers from a numbing fear that defendant someday again will take her child from her.  That fear undoubtedly will continue to haunt her for years to come.

38.    Defendant by his conduct also knowingly stole from his child the right to his mother's love and nurture.  Defendant acknowledged as much in the first recorded conversation with the child's mother and the conversations he had with her throughout the twenty two months that he kept the child in Egypt.  Nevertheless, defendant never took advantage of what by his own admission would have been an "easy" solution:  taking the child to a U.S. Embassy to exercise the child's right as an American citizen to return.  Instead, defendant selfishly kept the child in Egypt until he was able to guarantee his own return to the United States, in the form of a visa to accompany the child.  The concrete ways in which the harmful effects of defendant's crime have manifested themselves in the child are described in the mother's victim impact statement and the report of the child's psychologist.    As also is apparent from their comments, the emotional and developmental damage to the child will not readily be repaired.

<u>DEFENDANT'S FAILURE TO ACCEPT RESPONSIBILITY</u>

39.    Defendant continues to deny responsibility for his conduct in this case and indeed, his letters and submissions clearly suggest that he would not hesitate to do it again.  For example, in a letter that defendant sent to the undersigned Assistant shortly after his conviction, defendant boasted that he "feels pride for what I have done for my son."[2]  Defendant stubbornly clings to his claims of innocence, instead blaming his predicament on what he believes to be an overzealous agent and prosecutor, and the failures of his attorney.  *See, e.g.,* 8/28/07 letter from defendant to the Court; letter from defendant to the undersigned Assistant; defendant's response

---

[2]    This letter, which is written in Arabic, and a translation will be submitted to the Court under separate cover, as will another letter that defendant recently sent to the child's mother.

24

to PSR at pp. 11-12.  Perhaps most significantly, defendant has shown no insight into, or remorse for, the devastation he wrought on his child and the child's mother by their forced separation; instead, all of his missives focus on his defense of his conduct and his own current despair.

CONCLUSION

40.    This Court by its sentence cannot remedy all of the harm caused by defendant's crime.  However, the Court can send a message to defendant that the grievous consequences to his victims require him to be punished and that anyone afforded the privilege of residing in this country must abide by its laws.  The Court, the community, and the victims of this crime cannot risk that defendant will choose to repeat it.  The government therefore asks that the Court send that message loudly and clearly by sentencing defendant to the maximum term of imprisonment of three years.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

By: _____/s/_____
ANGELA G. SCHMIDT
Assistant United States Attorney
Texas Bar No. 17764980
Federal Major Crimes Section
555 4th Street, N.W., 4th Floor
Washington, D.C.  20530
(202) 514-7273
Angela. Schmidt@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**      :
                                       :
**v.**                              :      **Criminal No. 06-290 (TFH)**
                                       :
**KHALED MOHAMED SHABBAN,**      :
**also known as Khaled Rashad,**      :
**also known as Khaled Mohamed Rashad**  :
**Mohamed Mahmoud Shabban,**      :
**also known as Khaled Mohamed Rashad**  :
**Mohamed,**                        :
**also known as Mohamed Rashad Khaled,**  :
                                       :
      **Defendant.**                  :

## AFFIDAVIT OF SPECIAL AGENT SHANE DANA

I, Shane D. Dana, being duly sworn, depose and state as follows:

1.    I am employed as a Special Agent with the Federal Bureau of

Investigation (FBI) and have been so employed since November 3, 2003.   Since

completing training at the FBI Academy and specialized training in the area of white

collar crimes, I have been assigned to a white collar crime squad at the Washington

Field Office, Northern Virginia Resident Agency, Falls Church, Virginia.

2.    In October 2004, I initiated an investigation into a group of Egyptian

nationals, the defendant among them, suspected of engaging in insurance fraud based

largely on staged automobile accidents.  I gathered and analyzed historic evidence that

showed the best evidence for prosecution of the insurance fraud violations was

associated with Khaled Mohamed Shabban, who in 2003 and 2004 was averaging one

serious accident a month that often would result in a similar neck or back injury.  Mr.

Shabban previously had been deposed under oath by an insurance investigator for the

2

Maryland Automobile Insurance Fund (MAIF) and had admitted lying about an accident claim to a different insurance company. In the deposition, Mr. Shabban also referred to others who had taught him and who had made more money by filing similar insurance claims. As a result, I determined that a key element of an effective strategy to dismantling the group would be to arrest Mr. Shabban and determine whether he would be willing to cooperate against other members of the crime ring. However, such an arrest was not possible, since I learned that Mr. Shabban had abducted his child to Egypt.

3.    The abduction materially altered not only the course of the investigation as it pertained to Mr. Shabban, but it also stalled the investigation as to other members of the crime ring. I believe that had I proceeded with aggressive and overt investigative techniques such as arrests, search warrants or even participant interviews as to others, Mr. Shabban may have become aware of the investigation and, knowing his involvement in it, permanently remained out of the country with his child. Considering this possibility and the heartbreaking nature of the abduction case, in or about October 2005, I diverted attention and resources from the insurance fraud investigation to focusing on the return of Mr. Shabban and his son to the United States.

4.    For the next eleven months, I personally devoted hundreds of hours to the goal of returning Mr. Shabban and his son to the United States. Those hours included time spent interviewing Ms. Hernandez and numerous others; writing reports memorializing those interviews; and recording, reviewing and cataloguing over thirty tape recordings of often lengthy telephone conversations between Mr. Shabban and Ms. Hernandez. I also pursued alternative strategies to return Mr. Shabban and his son

3

to the United States. Those strategies required the preparation of detailed proposals and multiple briefings to obtain necessary authorizations. Within the FBI, squad supervisors, Assistant Special Agents in Charge, Special Agents in Charge, Unit Chiefs, Division Counsel and legal Attaches all were briefed about various courses of action. I also conferred with agents from the Department of Homeland Security, Immigration and Customs Enforcement (ICE) on these strategies, and I am aware that concurrence for one proposal was sought from the United States Attorney for the District of Columbia and officials within the Department of Justice.

5.    Beginning in the summer of 2006, when Mr. Shabban began to take steps to return his son to the United States by requesting a passport for him, I had numerous conversations with two FBI Assistant Legal Attaches (ALAT's) in Cairo, Egypt, briefing them on recent developments in the investigation. Those ALAT's in turn spent considerable time coordinating with State Department officials in Cairo and obtaining necessary approvals.

6.    In August 2006, when Mr. Shabban agreed to allow his son to return to the United States escorted by a friend of Ms. Hernandez, I obtained the necessary approvals for the FBI to pay over $4400 for plane tickets for the child and the escort and for related travel expenses. Additionally, coordination and planning was done to facilitate a safe and controlled itinerary for Ms. Hernandez's friend. During the escort's trip, I was in constant contact with ALAT's as we tracked her progress to and from Cairo. On the day that the escort was scheduled to return with the child, I worked with Ms. Hernandez from about 9:00 p.m. to 3:00 a.m., monitoring her numerous calls to Mr. Shabban, first attempting to wake him up so as not to be late, and then, when he finally

4

arrived at the airport after the escort already had boarded the plane, to persuade airline officials to allow the child to travel on the flight. Those efforts ultimately failed, and a few hours later, a fellow agent and I drove to New York City with Ms. Hernandez to pick up the escort. Our travel to New York and the anticipated return of the escort and child to New York required me to coordinate in advance with agents in the FBI's New York Field Office.

7. In the weeks that followed, Mr. Shabban, who then had the airline ticket the FBI had purchased for his son, indicated in consensually-monitored telephone conversations that he was making arrangements to allow his son to return to the United States escorted by an airline employee. On one occasion, with the assistance of FBI agents in New York City, I confirmed that Mr. Shabban had made flight arrangements for the child. I then again coordinated with New York agents in anticipation of the potential return of the child and perhaps also Mr. Shabban. I also again spent the evening and early morning hours before the scheduled flight working with Ms. Hernandez, who had numerous conversations with Mr. Shabban to determine whether the child would be on the flight. He was not.

8. In September 2006, with encouragement from Ms. Hernandez, Mr. Shabban applied for a visa so that he could return to the United States. Again, I had numerous conversations with ALAT's from the U.S. Embassy in Cairo, Egypt to brief them about this development, and they in turn again spent considerable time coordinating with State Department officials in Cairo and obtaining necessary approvals. I also am aware that the Assistant United States Attorney conferred with State Department officials in Washington, D.C. on this matter.

5

9.    After Mr. Shabban had obtained his visa, I again enlisted the help of agents in New York City to obtain flight information. Finally, when the defendant's stated plans to return to the United States with his son in late September 2006 were confirmed, I once again coordinated with FBI agents in New York, who in turn coordinated with the necessary airport authorities in order to ensure that the arrest of Mr. Shabban and the reunion of the child with his mother would proceed as smoothly as possible. I then traveled with a fellow agent and Ms. Hernandez to New York, where on September 25, 2006, I arrested Mr. Shabban upon his return to the United States.

10.    In short, I was forced to delay my investigation of Mr. Shabban for insurance fraud because Mr. Shabban abducted his child to Egypt. In light of the abduction, I also delayed a broader investigation of a suspected crime ring involving Mr. Shabban and others for fear of alerting him to the investigation and jeopardizing any chance that he would return to the United States or allow his child to return. I and numerous FBI and other law enforcement agents and government officials then spent substantial government resources, in both time and money, seeking to return Mr. Shabban to the United States to face the pending abduction charge and to reunite Ayman with his mother.

SHANE D. DANA, Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me
this __26__ day of November, 2007

Notary public