HONORABLE THOMAS F. HOGAN, UNITED STATES CHIEF JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Docket No.: <u>06-CR-290</u> |
| | : | |
| vs. | : | SSN: <u>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</u> |
| | : | |
| **SHABBAN, Khaled Mohamed** | : | Disclosure Date: <u>August 31, 2007</u> |

FILED
DEC 20 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## RECEIPT AND ACKNOWLEDGMENT OF PRESENTENCE INVESTIGATION REPORT

This is to acknowledge that each of the undersigned has received and reviewed the Presentence Investigation Report (PSR) in the above-entitled case. The undersigned further acknowledges that:

### For the Government

(CHECK APPROPRIATE BOX)
    ( ) There are no material/factual inaccuracies therein.
    (✓) There are material/factual inaccuracies in the PSI report as set forth in the attachment herein.

_Angela Schmidt_                                _9/14/07_
Prosecuting Attorney                              Date

### For the Defendant

(CHECK APPROPRIATE BOX)
    ( ) There are no material/factual inaccuracies therein.
    ( ) There are material/factual inaccuracies in the PSI report as set forth in the attachment.

_____      _____      _____      _____
Defendant                 Date                  Defense Counsel              Date

### NOTICE OF OBLIGATION OF THOSE EXECUTING THIS FORM

Pursuant to Local Rule 32(f)(2), those executing this form shall first submit any material inaccuracies or disputes in writing by <u>September 14, 2007</u>, to U.S. Probation Officer <u>Kelli Cave</u>, telephone number <u>(202) 565-1357</u>, fax number <u>(202) 273-0242</u>.

Pursuant to Rule 32(b)(6)(B), effective December 1, 1994, it shall be the responsibility of the Attorney for the Government and the Defense Counsel to provide each other with a copy of the objections at the same time the objections are filed with the probation office.

FOR THE COURT

By:    Gennine A. Hagar, Chief
        United States Probation Officer

# GOVERNMENT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

**Paragraph 21**

The government believes that a two-level enhancement for obstruction of justice pursuant to USSG § 3C1.1 is warranted for two reasons: first, after the defendant abducted his child, he repeatedly questioned Ms. Hernandez about whether she had contacted the police, attempted to dissuade her from doing so, and instructed her what to tell anyone who inquired about his reasons for taking the child; and second, the defendant committed perjury at the motions hearing by claiming that he did not understand the *Miranda* warnings.

As examples of the defendant's obstructive conduct with respect to Ms. Hernandez, the government notes the following statements:

In a telephone conversation with Ms. Hernandez that took place shortly after the defendant took his son to Egypt, the defendant asked Ms. Hernandez whether she had gone to the authorities and warned her that no one could take the child from him:

> MR. SHABBAN. Chamaca, did you make any problem?
>
> MS. HERNANDEZ. Huh?
>
> MR. SHABBAN. Did you make any problem?
>
> MS. HERNANDEZ. Did I make problem with who?
>
> MR. SHABBAN. For me.
>
> MS. HERNANDEZ. Why?
>
> MR. SHABBAN. Did you go in the court?
>
> MS. HERNANDEZ. Yes. No, I have not going in the court. But I need to know what you going to do, Chamaco. What time do you want to come back?
>
> **Transcript of Tape 0 at p. 3.**
>
> MR. SHABBAN. . . . Trust me. Nobody can take my son from me. Nobody. Nobody in the United States of America, the people listening to me right now. Nobody can take my son from me. I'm not stupid. Trust me, Chamaca. If you (indiscernible) this way, trust me, Chamaca, nobody can handle this situation with me. I know what I'm doing. I know what I'm

2

doing. I know what I'm doing. Trust me, Chamaca. Don't let me keeping my son hiding all the time. Let him be free, let him be free. Don't cause me problem. Don't make me weak. (Indiscernible). Don't make me weak. Please, Chamaca, don't make me.

MS. HERNANDEZ. How I gonna make you weak if you... How I can make you weak? Come on.

MR. SHABBAN. Don't cause me problem. When you allow some people to listen to me right now. When you're doing this stuff, you're making me weak.

MS. HERNANDEZ. Yeah, but I'm in the office, so no one is listen to you.

**Transcript of Tape 0 at pp. 13-14.**

MS. HERNANDEZ. I don't know, Chamaco. I don't think that's right what you did. Poor my chiquitito, you know.

MR. SHABBAN. Please Chamaca, be smart, Chamaca, don't cause me problem, because if you cause me a problem, that's mean I'm going to be very weak.

**Transcript of Tape 0 at p. 17.**

Again, on November 7, 2005, the defendant admonished Ms. Hernandez to "be good":

MR. SHABBAN. Chamaca, be good, Chamaca. Don't be bad.

MS. HERNANDEZ. Okay. You, too. Take care of my chiquitito, okay? Please don't leave him with nobody.

MR. SHABBAN. Chamaca. Be good, don't be bad.

MS. HERNANDEZ. Huh?

MR. SHABBAN. Let me tell you something, Chamaca. Let me tell you something.

3

    MS. HERNANDEZ. Yes.

    MR. SHABBAN. Be good. Don't be bad. I did what I did for my son.

    MS. HERNANDEZ. Yeah.

    MR. SHABBAN. Okay?

    MS. HERNANDEZ. Alright.

    MR. SHABBAN. For my son, okay?

    MS. HERNANDEZ. Okay.

    MR. SHABBAN. Be good, Chamaca.

    MS. HERNANDEZ. Alright. And (indiscernible). Yes, no problem.

**Transcript of Tape 1 at pp. 15-16.**

On November 24, 2005, the defendant warned Ms. Hernandez not to do "any stupid stuff" and instructed Ms. Hernandez what to say in the event she was asked why he took the child to Egypt and "that's all":

    MR. SHABBAN. Okay, Chamaca. Chamaca, please, Chamaca.

    MS. HERNANDEZ. Huh?

    MR. SHABBAN. Don't do any stupid stuff.

    MS. HERNANDEZ. No, Chamaco.

    MR. SHABBAN. Please.

    MS. HERNANDEZ. Don't worry about it.

    MR. SHABBAN. Don't do any stupid stuff.

    MS. HERNANDEZ. No, Chamaco. I told you I going to send you money. I'll send you money. Don't worry about it.

    MR. SHABBAN. No, I'm not talking about the money. You know what I'm

4

talking about. You know exactly what I'm talking about.

    MS. HERNANDEZ. Then what, Chamaco?

    MR. SHABBAN. Don't do any stupid stuff, Chamaca for us.

    MS. HERNANDEZ. No, Chamaco. I told you no.

    MR. SHABBAN. Okay.

    MS. HERNANDEZ. Yes. No problem, Chamaco.

    MR. SHABBAN. Please.

    MS. HERNANDEZ. Yes, don't worry about it.

    MR. SHABBAN. Please. I didn't hurt my son, you know?

    MS. HERNANDEZ. I know.

    MR. SHABBAN. I didn't do any stupid stuff.

    MS. HERNANDEZ. Um-hum.

    MR. SHABBAN. I did the best for my son. I lost a lot for my son.

    MS. HERNANDEZ. Yes.

    MR. SHABBAN. Be smart, Chamaca.

    MS. HERNANDEZ. All right, Chamaco.

    MR. SHABBAN. Be smart.

    MS. HERNANDEZ. All right. Don't worry about it.

    MR. SHABBAN. Okay. I know you are good woman.

    MS. HERNANDEZ. Yeah.

    MR. SHABBAN. Okay.

    MS. HERNANDEZ. Don't worry about it, Chamaco. So you give me a call. I'm

5

not going to be in the store, alright, fat boy?

    MR. SHABBAN. Well, if somebody contact you. If somebody contacts contact you... to ask about it, just say what happened, ok. Say (indiscernible) Ayman will need to be in place just with one language because he was confused by the both language, and he cannot speak.

    MS. HERNANDEZ. Yeah.

    MR. SHABBAN. Okay?

    MS. HERNANDEZ. Yeah, but nobody has calling me.

    MR. SHABBAN. Be smart.

    MS. HERNANDEZ. Uh-huh. Nobody has calling me, Chamaco.

    MR. SHABBAN. They're going to call you. Don't worry. They're going to call you. The Congressman going to call you.

    MS. HERNANDEZ. Okay.

    MR. SHABBAN. Because I contact him, Chamaca, in the e-mail.

    MS. HERNANDEZ. Okay.

    MR. SHABBAN. Okay? He going to call you. Trust me.

    MS. HERNANDEZ. All right.

    MR. SHABBAN. They're going to call (indiscernible) information from you.

    MS. HERNANDEZ. Yeah.

    MR. SHABBAN. Ayman, why Ayman went Egypt. You talk to me. Why Ayman went Egypt?

    MS. HERNANDEZ. Why he went Egypt? Because in the school they tell him he has a problem because he's speaking three languages so he needs...uuum,...

6

MR. SHABBAN. Yes, Chamaca.

MS. HERNANDEZ. ...to speak only one language --

MR. SHABBAN. That's all what I -- that's all.

MS. HERNANDEZ. That's all, right?

MR. SHABBAN. Not more than that, okay?

MS. HERNANDEZ. Okay.

**Transcript of Tape 3 at pp. 6-8.**

In mid-August 2006, the defendant told Ms. Hernandez that he would allow the child to return to the United States. The Federal Bureau of Investigation then purchased a one-way plane ticket for the child and a round trip plane ticket for an escort to travel to Egypt to accompany the child back to the United States. The defendant, however, did not bring the child to the airport in time to make the flight. In the weeks that followed, the defendant, who then had possession of the child's plane ticket, told Ms. Hernandez that he had rescheduled the child's flight and made arrangements for the child to return with an airline escort. However, the defendant still was not able (or willing) to bring about the child's return. In mid-September 2006, the defendant applied for and obtained a visa allowing him to return to the United States for the purpose of taking his son to school. Just before doing so, the defendant on September 22, 2006, again questioned Ms. Hernandez about whether she went to the police, sought assurances that she would not to do so, and suggested that he could come alone first to test whether she had done so:

MR. SHABBAN. So we're ready to come, Chamaca, okay?

MS. HERNANDEZ. All right, Chamaco. No problem. Anytime, I told you.

MR. SHABBAN. Yes, Chamaca.

MS. HERNANDEZ. Don't worry about it, okay?

MR. SHABBAN. Don't break my life, okay?

MS. HERNANDEZ. Oh, come on. Um-um, don't worry about it.

MR. SHABBAN. Chamaca, you need me, Chamaca.

MS. HERNANDEZ. Yes.

7

MR. SHABBAN. (Indiscernible). When you found Ayman, how he is, you're going to say, "Khaled was right." You need me, Chamaca.

**Transcript of Tape 29 at p. 2.**

MR. SHABBAN. After I leave, me and Ayman, did you call the police? What did you tell them?

MS. HERNANDEZ. I didn't call the police. I wait until you call me because I didn't know where were you. You went to Kings Dominion or what do you do because you told me, "we're coming late." You have any problems, they come in and say to you, no.

MR. SHABBAN. Okay. The police come to my home, Chamaco. Why did they come to my home?

**Transcript of Tape 29 at pp. 3-5.**

MR. SHABBAN. (Indiscernible) we are coming and I wish, wish nothing bad happen, you know.

MS. HERNANDEZ. Now, what's going to happen, Chamaco?

MR. SHABBAN. I'm gonna die, Chamaca (indiscernible). Why? Because you know I'm gonna lost the opportunity to see my son all the rest of my life.

MS. HERNANDEZ. No.

MR. SHABBAN. That mean I gonna die, Chamaca. (Indiscernible) end up in jail, you know.

MS. HERNANDEZ. No, Chamaco.

MR. SHABBAN. I'm gonna be in jail. I'm going to lose my son (indiscernible). I don't think you like that.

8

MS. HERNANDEZ. No, Chamaco.

MR. SHABBAN. I don't think so.

MS. HERNANDEZ. No.

MR. SHABBAN. I'm coming back, you know. I'm coming back. Let me tell you example, Chamaca. I wish you would understand that. I have a visa for five years, multi-entrance.

MS. HERNANDEZ. Um-hum.

MR. SHABBAN. That I come and I leave. I come and I leave, okay? If, for example, (indiscernible) to help my son. For example, you know, I can come by myself first to check out what's going on. And then I come back to get my son. But I don't want to do that, because, if I had something bad happen to me, where my son is going to be? He's going to be with you, okay?

MS. HERNANDEZ. Um-hum.

MR. SHABBAN. But if I come alone and something happen with me, where is going to be my son? He's going to be in Egypt. I don't want that.

MS. HERNANDEZ. Yes.

MR. SHABBAN. You understand, Araceli.

MS. HERNANDEZ. Um-hum.

MR. SHABBAN. I'm coming -- I don't know what's going to happen to me. But, I'm just coming, you know.

**Transcript of Tape 29 at pp. 5-6.**

9

    MR. SHABBAN. It's dangerous for me and I am in risk. (Indiscernible) what happen if I went there, and just arrived to airport in New York and they lock me up? What can I do? I have nothing to do. But it's good for my son. Why? Because my son is going to be with his mommy. And if I don't care about son, I should, you know what? Leave Ayman in Egypt and go to first, to the USA, and if it is fine, bring Ayman. If it is not fine, go back to Ayman.

    MS. HERNANDEZ. Yeah.

    MR. SHABBAN. You hear me? You get my point?

    MS. HERNANDEZ. Yeah.

    MR. SHABBAN. If I don't care about Ayman. But I care about Ayman.

    MS. HERNANDEZ. Alright.

    MR. SHABBAN. (Indiscernible).

    MS. HERNANDEZ. Yeah I know that.

    MR. SHABBAN. You understand what I mean?

    MS. HERNANDEZ. Yes, Chamaco. No problem. I told you, whatever you want, it's alright for me, Khaled. Okay?

    MR. SHABBAN. You swear of your mommy?

    MS. HERNANDEZ. I swear. No problem. I swear for Ayman. Whatever you want, it's okay, Chamaco. You want to do like this, no problem.

    **Transcript of Tape 29 at pp. 13-14.**

    The import of these conversations is clear: had the defendant known with certainty that Ms. Hernandez had reported or would report the child's abduction to the court or the police, he would not have returned to the United States or permitted his son to return. This conduct falls squarely within the definition of obstructive conduct in USSG § 3C1.1, specifically the examples set forth in the Commentary's Application Notes 4(a) ("threatening, intimidating, or otherwise

10

unlawfully influencing a ... witness ..., directly or indirectly, or attempting to do so" and 4(k) ("threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction").

The case law supports the application of an obstruction of justice enhancement under these circumstances. *See, e.g., United States v. Peterson*, 385 F.3d 127, 139-43 (2d Cir. 2004) (enhancement applied to defendant who wrote letters to co-defendants "urging them not to cooperate with the Government, to maintain certain stories and positions, and to repeat certain versions of events that were not true"); *United States v. Cole*, 359 F.3d 420, 431 (6th Cir. 2004) (enhancement applied to defendant who told victim that he had her address and would "send someone to kill her" if she told anyone about the incident); *United States v. Thompson*, 210 F.3d 855, 861-2 (8th Cir. 2000), *cert. denied*, 532 U.S. 996 (2001) (enhancement applied to defendant who, among other things, had telephoned witness and "demanded that [the witness] swear on the lives of his children that he had not cooperated with authorities"); *United States v. Booth*, 996 F.2d 1395, 1397 (2d Cir. 1993) (enhancement applied to defendant who instructed victim not to talk to the FBI about sexual activity or drug use and to tell other victims not to talk to the FBI); *United States v. Atkinson*, 966 F.2d 1270, 1277 (9th Cir. 1992), *cert. denied*, 507 U.S. 1004 (1993) (enhancement applied to defendant who contacted witnesses and told them not to speak with the police and who helped concoct a false story the witnesses should tell the authorities if forced to do so); *United States v. Cherif*, 943 F.2d 692, 703 (7th Cir. 1991), *cert. denied*, 503 U.S. 961 (1992) (enhancement applied to defendant who wrote a letter to witness telling her that she "could not know anything" about scheme, which court construed as "a subtle and somewhat clever attempt to tell her, 'Don't spill the beans'"). *See also United States v. Craft*, 478 F.3d 899, 901 (8th Cir. 2007) (evidence that defendant had contacted two witnesses and instructed them not to cooperate with investigators sufficient to support witness tampering conviction); *United States v. Morrison*, 98 F.3d 619, 629 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1131 (1997) (evidence that defendant told witness what to say "if anybody asks me," which account was false, sufficient to support witness tampering conviction).

Moreover, the defendant obstructed justice in this case by testifying falsely at the motions hearing on June 15, 2007. Specifically, the defendant testified that he did not understand the concept of a "right," as used in the *Miranda* advice of rights warnings, in terms of a privilege or an entitlement, but rather only as to direction, that is, as in "right or left," or as to propriety or accuracy, that is, as in "right or wrong."

The defendant's testimony at the motions hearing was contradicted directly by two statements he made in recorded telephone conversations with Ms. Hernandez. Specifically, the defendant on November 7, 2005, stated:

> MR. SHABBAN. Yeah, it's easy for me to take Ayman from his hand, and his bed, and his clothes, his books, his toys, and go to the embassy. "Excuse me, guys, please," you

11

know, "I don't want my son to be in Egypt. I don't want my son to grow up in Egypt. I don't like that. I am -- I'm here with my son just to help him to speak and now my son is good. I want him to continue United States, he's an American, and have right to be in the United States." Okay?

**Transcript of Tape 1 at p. 9.**

And again on June 14, 2006, the defendant stated:

MR. SHABBAN. ... I have him here in my country, nobody in the world, in the world can have him, can take him out of my hands. Only one. It's him. He's asking you without no question, he's asking me, "daddy, where is my mommy?" Before he asking me this question, I have to show him his mommy. It's his right, you know? I cannot just be happy, with my son hurt, no way. Be smart, Chamaca.

**Transcript of Tape 25 at p. 3.**

In denying the defendant's motion to suppress his post-arrest statements to the FBI, the Court specifically noted that it had "great difficulty" with the credibility of the defendant's testimony and cited these recorded statements as evidence that before his arrest, the defendant understood the concept of a "right" as an entitlement or privilege, despite his testimony to the contrary. This finding amply provides clear and convincing evidence of the Court's conclusion that the defendant lied during his testimony at the motions hearing.

The defendant's false testimony at the motions hearing falls squarely within the definition of obstructive conduct in USSG § 3C1.1, specifically the example set forth in the Commentary's Application Note 4(b) ("committing ... perjury"). The testimony bore directly on the crux of the defendant's motion to suppress his statement to the FBI, that is, whether he understood and voluntarily waived his *Miranda* rights. Moreover, his testimony on this point was wilful and not the result of confusion, mistake or faulty memory. *See United States v. Gaviria*, 116 F.3d 1498, 1529 (D.C. Cir. 1997), *cert. denied sub nom.*, 522 U.S. 1082, 1132 (1998) (enhancement properly applied because district court credited other witness's trial testimony over that of defendant and defendant's testimony was contradicted in taped conversations).

**Paragraph 27**

The government believes that a three-level enhancement applies because the offense resulted in "substantial interference with the administration of justice." USSG § 2J1.2(b)(2).

12

The Guidelines define this phrase to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." USSG § 2J1.2, comment. (n.1). This list is not exhaustive and "other acts-if similarly or even more disruptive of the administration of justice-could serve as bases for the ... enhancement." *United States v. Amer*, 110 F.3d 873, 885 (2d Cir.), *cert. denied*, 522 U.S. 904 (1997). The government believes that this specific offense characteristic applies for three reasons: first, the defendant took his son to Egypt to avoid a clash between "American law" and his view of what was in the best interest of his son's education; second, the defendant's conduct interfered with an ongoing criminal investigation into staged automobile accidents; and third, the defendant's conduct resulted in the unnecessary expenditure of substantial government resources.

In *Amer*, also an international kidnaping case, the Court upheld the application of a three-level enhancement to the defendant's offense level for "substantial interference with the administration of justice," finding that the defendant's "'self-help' act of removing the children from New York could serve as a basis for the enhancement. Although the abduction did not interfere with an ongoing proceeding, this act prevented proper legal proceedings from occurring by taking matters completely outside the purview of the administration of justice." *Id.* In reaching this conclusion, the Court quoted favorably from the District Judge's comment that, "It is a situation in which he deemed himself the judge, and then he made the decision.... The defendant ... wholly ignored the lawful process, and acting in the form of a vigilante, if you will, took matters into his own hands." *Id.*

Here, too, the defendant took matters into his own hands and left the United States with his son specifically to avoid "American law." As he explained to Ms. Hernandez in a telephone conversation on January 17, 2006:

> MR. SHABBAN: Do you believe why we leave together, or no?
>
> MS. HERNANDEZ: Who, you and bebito?
>
> MR. SHABBAN: Tell me the truth.
>
> MS. HERNANDEZ: Huh?
>
> MR. SHABBAN: Yes, do you believe why we left, that's how I said to you or not?
>
> MS. HERNANDEZ: How did you --
>
> MR. SHABBAN: (Indiscernible).

13

MS. HERNANDEZ: -- leave like? You get out?

MR. SHABBAN: Yes, why?

MS. HERNANDEZ: Why?

MR. SHABBAN: Do you know why?

MS. HERNANDEZ: Yeah.

MR. SHABBAN: Do you believe what I said to you?

MS. HERNANDEZ: Yes. You know why? You have your own way to do these things, Chamaco. And one thing that I know, you love the child, you know? And you did that because --

MR. SHABBAN: (Indiscernible).

MS. HERNANDEZ: Huh?

MR. SHABBAN: Let me tell you something, Chamaca. Maybe it can make you feel much better before, you know? In American law, they don't care about how we feel.

MS. HERNANDEZ: Um-hum.

MR. SHABBAN: Okay? The law in America is very strong, everybody under the law, okay? The law in America is to protect the kids the best that you can, you know?

MS. HERNANDEZ: Um-hum.

MR. SHABBAN: The first thing, the kids. It doesn't matter what other people going to feel or going to think or going to do, you know? The important thing is the kids.

MS. HERNANDEZ: Yes.

MR. SHABBAN: But when they misunderstand the kids, it's a big problem.

\* \* \*

14

MR. SHABBAN: ...We cannot do nothing with a social worker if, if she decides to send Ayman to another school. Why? Because the American law force anybody to do the good and the best for the kids. And American law going to believe the social worker and never going to believe us for two reason: I'm Arabic Muslim and you are Hispanic born. You understand?

MS. HERNANDEZ: Um-hum.

MR. SHABBAN: This is what is going to happen with Ayman. Now, I'm glad, Chamaca. I come here because I know my country's very good with children ....

**Tape 9**

The defendant also should receive a three-level enhancement for "substantial interference with the administration of justice" because his conduct in taking his son to Egypt substantially interfered with an ongoing criminal investigation. In October 2004, the FBI initiated an investigation into a group of Egyptian nationals, the defendant among them, engaged in insurance fraud based largely on staged automobile accidents. The case agent quickly learned that the group not only was committing insurance fraud, but also was involved in numerous other illegal activities. The agent gathered and analyzed historic evidence that showed the best evidence for prosecution of the insurance fraud violations was associated with the defendant, who in 2003 and 2004 was averaging one serious accident a month that would result in an alleged back injury and who previously had been deposed under oath by an insurance investigator and had admitted lying about some of his claims. As a result, the agent determined that an effective strategy to begin dismantling the group would be to arrest the defendant and determine whether he would be willing to cooperate against other members of the crime ring. However, such an arrest was not possible, since by then, the defendant already had abducted his child to Egypt.

The abduction materially altered not only the course of the investigation as to the defendant, but also stalled the investigation as to other members of the crime ring. Had the agent proceeded with aggressive and overt investigative techniques such as arrests, search warrants or even participant interviews as to others, the defendant may have become aware of the investigation and, knowing his involvement in it, permanently remained out of the country with his child. Considering the heartbreaking nature of the abduction case, the agent decided to delay the progress of the insurance fraud investigation and divert attention and resources from that investigation to returning the defendant and his son to the United States.

15

Finally, the defendant should receive a three-level enhancement for "substantial interference with the administration of justice" because his conduct in taking his son to Egypt resulted in the unnecessary expenditure of substantial governmental resources to secure his and the child's return to the United States. These resources included hundreds of hours devoted by the case agent to interviewing Ms. Hernandez and numerous others; recording, reviewing and cataloguing over thirty tape recordings of often lengthy telephone conversations between the defendant and Ms. Hernandez; pursuing alternative strategies to return the defendant and the child to the United States; and briefing numerous U.S. Embassy officials, supervisory FBI officials and other law enforcement officers about various courses of action. Moreover, in addition to its operational expenses associated with agent travel to New York on two occasions in anticipation of arresting the defendant and recovering the child, the FBI spent over $4400 for plane tickets for the child and the escort and related travel expenses. These substantial expenditures of time and money clearly warrant the enhancement. *See United States v. Tackett*, 193 F.3d 880, 886-7 (6th Cir. 1999) (enhancement supported if district court can "(1) identify a particular expenditure of government resources (time or money), (2) which but for the defendant's conduct would not have been expended, and (3) was 'substantial' in amount").

**Paragraph 28** - The child was **three** years old at the time of his abduction.

**Paragraph 29** - With the enhancements sought by the government, the defendant's adjusted offense level would be 21.

**Paragraph 43** - The government disputes the defendant's contentions about the reasons for Ms. Hernandez's pregnancy and the couple's separation. Moreover, the government notes that when Ms. Hernandez became pregnant, the defendant told Ms. Hernandez that he did not want anything to do with the child, and he subsequently signed a written agreement to that effect.

**Paragraph 44** - Although Ms. Hernandez admittedly pulled the defendant by the ear when he first came to visit his son, she adamantly denies choking him. Indeed, after the hearing that resulted in the Civil Protection Order referenced in this paragraph, the defendant boasted to Ms. Hernandez about how easy it had been to obtain the witness's false testimony simply by paying her $100. This experience caused Ms. Hernandez to fear that the defendant could jeopardize her pending application to adjust her immigration status by making future false claims and thus contributed heavily to her subsequent decision to enter into the joint custody order and agree to change the child's name.

**Paragraphs 50 - 52** - The injuries and claims referenced in these paragraphs are the subject of a separate criminal investigation of the defendant in the Eastern District of Virginia into insurance fraud based on staged automobile accidents.

**Paragraph 54** - The defendant's claim that he does not use illicit substances because of his religious beliefs is contradicted by a former roommate, who indicated in interviews conducted in February and May 2007 that the defendant regularly smoked marijuana.

16

**Paragraph 57** - Despite reported earnings of only $7767 in 2001, the defendant on August 23, 2001, stated in the Complaint for Custody of his son that he was earning $24,500 year. This statement was made subject to criminal penalty for the making of a false statement.

**Paragraph 68** - With the enhancements sought by the government, the guideline range for imprisonment is 37-46 months.